ADAMS v. STATE.

Opinion delivered April 9, 1928.

1. HOMICIDE—ISSUE AS TO MURDER IN FIRST DEGREE.—In a prosecution for murder, evidence *held* to justify submitting the issue as to defendant's guilt on a charge of murder in the first degree.

2. CRIMINAL LAW—DISCRETION AS TO CONTINUANCE.—Ruling of the trial court in granting a continuance or postponement will not be reversed unless it clearly appears that the trial court abused its discretion, and that the ruling operated as a denial of justice.

3. CRIMINAL LAW—RIGHT TO BE HEARD BY COUNSEL.—The constitutional right of accused to be heard by his counsel under Const., art. 2, § 10, does not contemplate that he shall be heard at all times by all of the counsel that he may see proper to employ.

4. CRIMINAL LAW—REFUSAL OF POSTPONEMENT.—Where defendant had eight attorneys and ample time intervened for taking depositions before the conclusion of the trial, refusal of the court to continue or postpone the cause for the taking of depositions was not error, where the court gave defendants opportunity to take the depositions of such witnesses in an adjoining county to be read before the close of the trial.

5. CRIMINAL LAW—ABSENCE OF NON-RESIDENT WITNESSES.—It was not an abuse of discretion to overrule a motion of continuance on the account of absence of non-resident witnesses, who are beyond the court's jurisdiction.

6. CRIMINAL LAW—REFUSAL OF CONTINUANCE.—It was not an abuse of discretion to refuse a continuance to secure the testimony of witnesses living about 35 miles distant and beyond the State line, notwithstanding the sheriff's testimony that he could probably catch the witnesses during one of their frequent visits into the State, where a large number of witnesses were required to be in attendance by reason of change of venue, and delay would cause inconvenience and expense.

7.  HOMICIDE—INSTRUCTION AS TO SELF-DEFENSE.—In a prosecution for murder, an instruction that defendant could not justify a killing in self-defense, if he could reasonably have withdrawn from or avoided the difficulty with safety to himself after it began and failed to do so, *held* proper under the evidence and not objectionable as invading the jury's province.

8.  CRIMINAL LAW—REPETITION OF INSTRUCTIONS.—It was not error to refuse instructions fully covered by instructions given.

9.  CRIMINAL LAW—INCOMPLETE AND ARGUMENTATIVE INSTRUCTIONS.—It was not error to refuse requested instructions which were incomplete and argumentative in form, where they unduly stressed particular phases of the testimony.

10. CRIMINAL LAW—INSTRUCTION AS TO CIRCUMSTANTIAL EVIDENCE.—In a prosecution for murder in which proof of guilt depended upon direct testimony, a requested instruction that, in case there were two reasonable views of evidence leading to conclusions of guilt or innocence, the jury should acquit, *held* properly refused where the court had properly instructed as to the credibility of witnesses, weight of evidence and presumption of innocence and reasonable doubt; the requested instruction being erroneous unless the case depended wholly on circumstantial evidence.

11. CRIMINAL LAW—EVIDENCE OF GOOD CHARACTER.—An instruction that the evidence of defendant's good character is substantive evidence in his favor was properly refused.

12. CRIMINAL LAW—ARGUMENT OF COUNSEL.—Trial courts are vested with wide discretion in determining whether the remarks of counsel in argument are within their legitimate scope.

13. CRIMINAL LAW—DUTY OF PROSECUTING ATTORNEY.—The prosecuting attorney is a public officer whose duty it is to use fair means to secure the conviction of the guilty without appealing to prejudice or perverting the testimony or making statements of facts to the jury which have not been proved.

14. CRIMINAL LAW—REMARKS OF PROSECUTING ATTORNEY.—Statements of one of the prosecuting attorneys in a murder prosecution deploring the fact that some of defendant's counsel were enlisted in behalf of the murderer in spite of their previous opposition to crime and remarks concerning their efforts to procure evidence, though improper, did not require a reversal where the jury were admonished not to consider such remarks.

15. CRIMINAL LAW—ARGUMENT OF COUNSEL.—While the Supreme Court will always reverse where counsel go beyond the record to state facts that are prejudicial to defendant, unless the trial court by its ruling has removed the prejudice, it will not reverse for mere expression of opinion of counsel in their argument, unless so flagrant as to arouse passion and prejudice and necessarily having that effect.

Appeal from Lafayette Circuit Court; *J. H. McCollum*, Judge; affirmed.

*Allen Hamiter, Jim Landes, Searcy & Searcy, Luke Monroe, J. D. Head* and *Carter & Carter*, for appellant.

*H. W. Applegate*, Attorney General, and *John L. Carter*, Assistant, for appellee.

WOOD, J. This is the second appeal in this case. 173 Ark. 714, 293 S. W. 19. On the first appeal the cause was reversed, and remanded for a new trial because of the error of the trial court in refusing certain prayers of the appellant for instructions.

The facts were stated on the former appeal as follows: "In October, 1925, appellant, who had previously served as chief of police of the city of Texarkana, and Virgil Grigson, who was at the time constable of the township in which that city is located, were engaged in the retail meat and grocery business in Texarkana. Grigson had invested about $3,000 in the business and appellant about $160. They had disagreed and had quarreled, and, on and prior to the day on which Smith was killed, both had been drinking heavily. On the morning of the killing appellant went to the home of Osborne Carpenter to get a large pistol, which he had previously exchanged with Carpenter for a smaller one, and, in examining the pistol to ascertain whether it was loaded, it was accidentally discharged. Appellant told Carpenter he wanted the pistol to shoot beeves with, as he had only a single-action one, and on one occasion he had shot a beef with a smaller gun, and the bullet glanced off the head of the beef and came near hitting the man who was employed to help appellant butcher the beef. In addition to this pistol, Grigson had a Winchester rifle, which was kept at the store for the same purpose. Grigson and appellant had a quarrel in the store, and appellant and his sons took Grigson's pistol away from him. Appellant offered several times that day to fight Grigson, but the challenge was not accepted. Grigson attempted to telephone the police from the

store, but appellant refused to permit him to use the telephone. Grigson directed his son to call the police, but the sons of appellant refused to permit him to do so. Grigson went to his car, but appellant took the key out of the car, and would not permit Grigson to leave in it. Grigson then went to a filling station a block away from the store, and attempted to call the police headquarters, but got no response. Grigson then called the sheriff's office, and requested the sheriff to come to the filling station where he then was. In a short time Lish Barber, the sheriff of the county, and Bob Smith, his deputy, drove up to the filling station in separate cars. Grigson told the officers about the difficulty he had had with appellant, whereupon the sheriff, his deputy and Grigson drove to the store. It was admitted that appellant and his sons knew that Grigson had gone to call the officers. When the party reached the store they walked in, Grigson leading, the sheriff next, and Smith behind, and, as they came into the store, Wallace Adams, a son of appellant, remarked, 'Daddy, there is Lish Barber,' and appellant replied, 'Damn Lish Barber—nobody is going to arrest me.'

"The State's testimony is to the effect that Allen Adams, a younger son of the appellant, was also in the store when the officers came in, and that Adams and his sons placed themselves as follows: Wallace Adams was behind a counter, near the front door, armed with his father's pistol; Allen Adams, the younger son, was in another corner of the store, armed with the Winchester rifle; and appellant was near the center of the store, behind a small counter, armed with a knife. Ruth Shumaker, a young lady whose home was near appellant's store, testified that she saw Barber get out of his car, and that he spoke to her, and smiled. Barber walked near the center of the store, and in a friendly way said, 'Hello, Hendricks.' The testimony is sharply conflicting as to what then occurred, and the State's version was not developed until after the appellant had put on

his testimony, and one of the errors assigned is the order in which the State was permitted to develop its case. We state this testimony at this time to preserve the proper chronology. According to appellant and his sons, who testified in their father's behalf, Barber's first remark was to inquire, 'What is the matter with you and the big Irishman?' meaning Grigson. Appellant answered, 'The big son-of-a-bitch was trying to run me out of my business, and nobody can do that.' Appellant testified that, when he said this, Grigson jumped back and began to curse, and, as appellant turned towards Grigson, Barber shot appellant, the ball going through appellant's arm, penetrating his body and lodging in his lung. Appellant further testified, that as soon as Barber shot him, Wallace Adams seized Barber's pistol, and a scuffle for its possession ensued, and that Barber struck Wallace over the head with the pistol. Appellant then took the rifle from the hands of his younger son, Allen, and, as he did so, Barber threw Wallace from him and started towards appellant with his pistol drawn on him, whereupon appellant shot Barber with the rifle. Barber then turned and ran through the screen door, and this was the last appellant saw of Barber.

"Grigson, who was called in rebuttal, and whose testimony was objected to upon the ground that his testimony was not rebuttal, stated that, when Barber entered the store, Adams came from behind the counter with the knife in his hand, and advanced on Barber, who slowly retreated, pushing appellant back, and telling appellant to drop his knife, but appellant advanced, and struck at Barber with his knife, cutting Barber's hand and left wrist to the bone, and, when Barber drew his pistol, Allen Adams and Barber both fired, and Wallace Adams shot Smith, inflicting a slight flesh wound. All three shots were fired so near together that you could not tell who fired first. Grigson fell down behind the counter, and went out the back door. The shot fired by Allen

Adams knocked Grigson's hat off his head. Appellant denied cutting Barber, and denied that Barber was cut, but several witnesses, including the undertaker who prepared Barber's body for burial, testified to the existence of the knife wounds.

"Grigson testified that Smith and Barber left the store, and appellant followed them, and while Barber, who had got into the street, was backing away, appellant shot Barber just above the heart, and Barber died in a few minutes. Just as this fatal shot was fired, Smith, who was about two-thirds across the street, fired two or three shots at appellant as appellant was advancing on Barber. Smith then passed behind an automobile parked on the side of the street, and from there he went along the walk to the house of a man named Whitney, through whose yard he walked, coming out at the rear of Whitney's lot. Smith then went to the store of J. H. Scott, and appellant saw Smith enter the store. Appellant admitted that, after shooting Barber, he went back into the store, but, in a short time, he came out again and started for Scott's store with the rifle under his arm. Some boys who saw appellant coming remarked, 'Yonder he comes, and he will kill all of us.' Smith and Scott heard this remark, and they came to the door of Scott's store, and Smith cried out to appellant, 'Henry, I give up, I throw my gun away,' and as he said this he drew his pistol from his holster and pitched it in the street, six or eight feet beyond the sidewalk. Appellant called Smith a vile name and said, 'Yes, give your soul to God,' and shot Smith. Appellant denied hearing the remark Smith made about giving up, but two witnesses, who were further from Smith than appellant was, testified that they heard the remark. Smith ran out of the store, and, as he was passing out the rear door, appellant again shot Smith, who died the following day. Scott remonstrated with appellant, who said, 'I'll kill every damn one of them.' "

At the last trial a witness for the defendant by the name of Wead testified that he saw Bob Smith go across

the street from Mrs. Shumaker's house.   He turned right down toward Grigson's store, went about thirty feet in that direction, then turned around and started back toward old man Scott's store.

Mrs. Jenkins, a witness for the defendant, testified that she saw Bob Smith come out of the back of Scott's store and run.   She heard a lot of shooting—couldn't say that she heard a shot just as he came out.   He didn't fall, but ran awfully fast.   He ran down by the side of Mrs. Edwards' house and on into Jackson Street, near the welding shop.   He didn't run like he was hurt. Witness didn't hear him holler when he came out of the back door.   She was close enough to have heard him holler if he had done so.

Clyde Hicks, a witness for the defendant, testified that he took Smith to the hospital after he was shot. Smith told him that Henry Adams shot him, and that he (Smith) emptied his gun at Adams.   Witness was holding Smith up in the automobile at the time.   Smith said that he thought he was dying.

Dr. Hunt, witness for the defendant, testified that he was called to see Bob Smith after he was brought to the hospital.   He heard Smith make a statement just before he was operated on.   Smith stated that he emptied his gun.

Virgil Grigson, a witness for the State, testified that he called Lish Barber, the sheriff, over the telephone, and told him that he and Henry Adams had had some trouble, and he wanted him to come over there.   When Barber came into Burrow's store, witness told him about the difficulty he had with Henry Adams.   Witness was then asked what Barber said he would do, and answered, "I don't remember exactly what he did say—he said he would go up there and settle it—something—he said he would go up there and talk with him—something like that."   Just the exact words he used the witness couldn't say.

It is conceded by counsel for the appellant that, with the above exceptions, the testimony at the last trial

was substantially the same as it was at the former trial.
On the former appeal, after stating the facts, we said:
"We are of the opinion that the testimony recited fully
justified the court in submitting to the jury the ques-
tion whether the appellant was guilty of murder as
charged, and that the testimony is legally sufficient to
support the verdict rendered." After the above addi-
tional testimony developed at the last trial, we are still
convinced, after a careful consideration of all the tes-
timony in the record, that it was an issue for the jury
to determine whether the appellant was guilty of murder
in the first degree as charged. Indeed, learned counsel
for the appellant do not contend in their brief on this
appeal that there was no testimony to sustain the verdict.
The only grounds they urge for reversal on this appeal
are the following, which we will now consider.

1.  That the court erred in overruling appellant's
motion for a continuance of the cause until a subsequent
term to give the appellant an opportunity to have his
witnesses, George Shumaker and Lloyd Jones, present
at the trial, and erred in overruling the appellant's
motion for a postponement of the trial until the appel-
lant could have an opportunity of obtaining the deposi-
tions of these witnesses to be read at the present trial.

The appellant had George Shumaker and Lloyd
Jones subpoenaed as witnesses. They were served with
process, and failed to appear on the day the case was
set for trial. Appellant asked and obtained an attach-
ment for them.

Ruth Shumaker, a witness for the State, testified,
in substance, that "she was in the front part of her yard
when Barber and Smith drove up to the Adams & Grigson
store, and that Barber spoke to her, and smiled; that
she then was looking for a gas connection under the
front part of her house, and heard the first shot, and
that she raised up and saw Barber out in the middle
of the street, and saw Adams fire at him, and then saw
Barber throw his hand to his breast, and turn to go north

across the street, and fall; that she saw deceased, Smith, when he reached the sidewalk in front of her house, and saw him come into her yard and go behind her house, and then saw him come back into the street and cross over it and go in the direction of Scott's store, and enter Scott's store; and that, while Smith was crossing the street and going to Scott's store, she saw Adams follow him down the street, and that Adams was reloading his gun, and then saw Adams shoot at Smith in Scott's store door, and heard Smith holler, "Oh, oh," and then saw Adams go into Scott's store and shoot again, and when Adams came out of Scott's store she saw him look around at the back end of Scott's store, and shoot again at Smith as he ran off."

In his motion for a continuance the appellant set up that George Shumaker and Lloyd Jones would testify, in substance, that, about a week or ten days after Smith was killed by Henry Adams, they were present at the home of Ruth Shumaker, when she and her mother, Mrs. Cornelia Shumaker, were discussing the shooting of Smith and what they knew concerning the same; that in this conversation Ruth Shumaker stated that she was under the back end of her house, getting a stove connection, when the first shot was fired, and that she ran into the back of the house through the kitchen, and did not see any of the shooting; that Mrs. Cornelia Shumaker said, in Ruth's presence, that Ruth did not know anything about the shooting; that Ruth was out at the back end of the house looking for a connection for a gas stove, and that she ran into the back end of the house through the kitchen up to where Mrs. Shumaker was in the front part of the house; that Ruth didn't see any of it; that Ruth acknowledged that that was true; that George Shumaker testified that he was the uncle of Ruth Shumaker, and that, after the trial at the former term of the court, some time in the spring of 1927, he was visiting Mrs. Cornelia Shumaker, when Ruth Shumaker was present; that at that time she asked witness to buy her

a pair of stockings, and told him that Mrs. Lillie Barber, the wife of Lish Barber, had not paid her yet, and that if she could get the death sentence of defendant Henry Adams, she, Ruth Shumaker, would be able to buy George Shumaker some socks.

The motion set up that George Shumaker lived at Nash, Texas, five miles from Texarkana; that he frequently visited the city of Texarkana, and worked there as a common laborer; that his wife was at that time in a hospital at Texarkana for an operation, and that witness was in attendance at the hospital, and could be served with process and compelled to come to court if the case were postponed for a reasonable time, and, if not, the court ought to grant a postponement for the purpose of allowing his deposition to be taken; that said deposition would have been taken but for the fact that the witness faithfully promised that he would be present in response to the subpoena that had been served upon him, and defendant believed that he would have been present but for the untimely illness of his wife; that Lloyd Jones, the other witness, also lived at Nash, Texas, and was often in the city of Texarkana, and had faithfully promised the defendant that he also would be present at the trial; that, in the event he could not be reached by the attachment which had been issued for him, the court should grant a continuance or a postponement of the trial, to the end that his testimony might be had.

On the hearing of the motion, the sheriff of Miller County testified that the attachment for these absent witnesses was placed in his hands on the morning after the court convened, October 31, 1927; that it was thirty miles from Lewisville to Texarkana; that he reached Texarkana about one o'clock on the day the attachment was placed in his hands, but could not find the witnesses Shumaker and Jones. He believed, if he were given more time, he could catch both of them in Texarkana; that people who lived close to Texarkana, whether in Arkan-

-sas or Texas, and who came there to trade, almost necessarily go from one State to the other while there, and, if given a reasonable time, he could in all probability catch both Shumaker and Jones in Miller County, Arkansas. He learned that Shumaker had been in Texarkana on the day he went there to serve the attachment, but had taken his wife home that morning from the hospital.

Judge Carter, one of the attorneys for the appellant, and who was sworn as a witness, stated that the defendant did not receive information about what the witnesses Shumaker and Jones would testify until about a month after the first of September, 1927, when the defendant had the subpoena issued for his witnesses, and, when the defendant first received information about what the witnesses Shumaker and Jones would testify, they immediately had an extra subpoena issued and served by the sheriff on these witnesses in Miller County, Arkansas.

As soon as the testimony of Judge Carter was completed, the court announced that the attorneys for the defendant might take the depositions of these witnesses in or out of the State, and that the depositions would be read, if they could be had before the close of the trial. Thereupon J. D. Head, one of the attorneys for the defendant, requested the court to specify the time for the defendant to have an opportunity to take the depositions, and that the attorneys be relieved from their duties in the case and the cause adjourned over, to the end that the attorneys might go and take the depositions of these witnesses. The court thereupon announced as follows: ''There are several attorneys representing the defendant in this case, and either one of the attorneys may go out any time he chooses to take the depositions of these witnesses, if they desire to do so.'' The court thereupon overruled the motion to continue or to postpone, to which ruling the appellant duly excepted.

It has been the unvarying practice of this court since its origin not to reverse the ruling of the trial court in granting or refusing such motions unless it clearly

appears that the trial court has abused its discretion in making the ruling and that such ruling manifestly operates as a denial of justice. As early as *Burriss* v. *Wise & Hind,* 2 Ark. 33, we said: "This court would not reverse a decision or judgment below for merely granting or refusing a continuance, unless it clearly and positively appears from the face of the record that the court who decided the cause had been guilty of a palpable and manifest violation of public duty seriously prejudicing the rights of the parties complaining." And in *Price* v. *State,* 57 Ark. 165-167, 20 S. W. 1091, 1092, we said: "The continuance of causes in criminal and civil cases is in the sound discretion of the trial court, and its refusal to grant a continuance is never ground for a new trial, unless it clearly appears to have been an abuse of' such discretion and manifestly operates as a denial of justice." See cases there cited. See also *Bruder* v. *State,* 110 Ark. 402, 116 S. W. 1067; *Wood* v. *State,* 159 Ark. 671, 252 S. W. 897; *McDonald* v. *State,* 160 Ark. 185, 254 S. W. 549. All cases so holding are too numerous to cite here, as there is no uncertainty about the rule of practice. The difficulty always is to determine whether the trial court abused its discretion after applying the rule to the particular facts in any given case that were considered by the trial court in making its ruling.

Learned counsel for the appellant contend in their brief, and have likewise earnestly insisted in oral argument, that, under the facts as above set forth, the trial court abused its discretion in overruling their motion for a continuance, or at least for a postponement of trial of the cause, to give them an opportunity to take the depositions of witnesses Shumaker and Jones. There are at least two sound reasons why this contention of counsel cannot be sustained. In the first place, it appears from the record that eight attorneys were counsel for the appellant. When the motion for a continuance, or for a postponement, was being considered, the court announced that there were several attorneys, and that

either one of them, upon notice to the attorney for the
State, might go out any time to take the depositions of
these witnesses, if they desired to do so, and that such
depositions would be read before the end of the trial.
The trial was set in the Lafayette Circuit Court on change
of venue from the Miller Circuit Court, and was to begin
October 31, 1927. The actual trial before the jury began
on November 1, 1927, and was concluded November 4,
1927. The distance between Lewisville, the county seat
of Lafayette County, where the trial was being conducted,
and Texarkana, Miller County, and the place in Texas
where witnesses Shumaker and Jones lived, was not over
thirty-five miles. It is obvious therefore, from the facts
which appellant alleged he could prove by these witnesses,
that the depositions could have been quickly and easily
taken and in ample time to have returned to the Lafayette
court before the trial was concluded. All of this could
have been done without depriving the appellant of his
constitutional right to be heard by counsel. While the
Constitution guarantees to the accused the right to be
heard by his counsel (§ 10, art. 2, Constitution of 1874),
this provision does not contemplate that he is deprived
of any constitutional right unless he is heard at all times
by all of the counsel that he may see proper to employ.
Therefore, under the liberal offer of the court to have
the depositions of these witnesses taken and read at any
time the defendant might desire to do so before the close
of the testimony, it would appear that the trial court
did not abuse its discretion in refusing to continue the
cause to a subsequent term, nor in refusing to postpone
the trial of the cause to a future day in the term. What
the court actually did was tantamount to granting the
appellant an opportunity to take the depositions of these
witnesses and producing such testimony by deposition.
The appellant did not therefore exercise due diligence
to procure and produce the alleged testimony of the wit-
nesses Shumaker and Jones, as set forth in his motion
for a continuance.

In the second place, this court has heretofore always ruled that a trial court does not abuse its discretion in overruling a motion for continuance on account of the absence of witnesses where it is shown that such witnesses are nonresidents of the State and thus beyond the jurisdiction of the court. This, for the obvious reason that the court has no power through any of its process to compel the attendance of such witnesses. In *Bruder* v. *State, supra,* we held, quoting syllabus: "It is not an abuse of the trial court's discretion to refuse a continuance of a criminal trial on account of the absence of nonresident witnesses." See also *Turner* v. *State,* 135 Ark. 381-383, 205 S. W. 659, and cases there cited; also *Freeman* v. *State,* 150 Ark. 387-389, 234 S. W. 267, and cases there cited; *Hayes* v. *State,* 156 Ark. 180, 245 S. W. 309, and cases there cited; and *McDonald* v. *State, supra.*

But counsel for appellant urge that all of these cases can, and should, be differentiated from the case at bar on the facts, which are bottomed mainly on the testimony of the sheriff to the effect that, if given a reasonable time, he could, in all probability, catch both Shumaker and Jones in Miller County, Arkansas, because they lived in close proximity thereto, and frequently were at Texarkana, the county seat of that county. Now, the record shows that this cause had been set as early as August 15, 1927, for trial on Monday, October 31, 1927. On account of the large number of witnesses residing in Miller County who had to be in attendance by reason of the change of venue and the magnitude of the cause and the length of time that would necessarily be consumed in the trial of the case, it involved large costs both to the State and county, as well as great inconvenience and considerable expense to the individuals connected therewith. Certainly the trial court was justified in taking all these circumstances into consideration in determining whether or not he should end the cause at that term or continue same to a subsequent term. The trial court

doubtless concluded that the probability of compelling
the attendance of witnesses Shumaker and Jones would,
at least, be no greater at a subsequent term of the court
than it then was. An attachment had been placed in the
hands of the sheriff for them, and he had attempted to
serve the same, but had been unable to do so. If these
witnesses, who resided beyond the jurisdiction of the
court, were then avoiding the court's process by remain-
ing beyond the jurisdiction of the court, they could at
all future times when the court was in session so escape
its process. Thus the court has no more than a *probabil-
ity* that, if the cause were continued, the attendance of
the witnesses might possibly be had at a subsequent term.
Under these circumstances we are convinced that the
trial court not only did not abuse its discretion but that
its discretion was in all respects wisely and correctly
exercised.

2. Counsel complain of the alleged errors of the
court in granting the State's prayer for instruction No.
18 and in refusing to grant appellant's prayers for
instructions Nos. 7 and 7a, 18, 19, 20 and 21. (See foot-
note). It would unduly extend this opinion and would
serve no useful purpose as a precedent to set out and
discuss in detail all of the assignments of error in the
rulings of the court in the granting and refusing prayers
for instructions. We have examined them all carefully,
and do not find that there was any error prejudicial to the
appellant in any of the court's rulings in this respect.
Let it suffice to say that the State's prayer for instruction
No. 18 (see footnote) does not invade the province of the
jury, was based upon the testimony, and is not susceptible
of the construction which counsel for appellant claim.

Appellant's prayer for instruction No. 7 and like-
wise No. 7a were fully covered by appellant's prayers for
instructions Nos. 7b and No. 8, which the court granted

(See footnote)*. Instruction No. 7b and No. 8 were given in the identical language of instruction No. 7b and No. 8, which were asked at the last trial and refused. This court on the former appeal held that the trial court erred in refusing appellant's prayers for instruction No. 7b and No. 8, and reversed the judgment and remanded the cause for a new trial because of such error. On the trial from which this appeal comes these prayers were

---

*NOTE: No. 18, for the State: "If the jury believes from the evidence, beyond a reasonable doubt, that the defendant could have, at any time from the beginning of the difficulty, if you find that there was a prior difficulty, to the ending of the meeting between himself and the deceased, when the deceased was killed, if you find beyond a reasonable doubt that he was killed by defendant at the ending of said last meeting between them, reasonably withdrawn from or avoided the difficulty, with safety to himself, but failed to do so, he could not justify the killing on the ground of self-defense."

"No. 7. You are instructed that neither the sheriff nor his deputy, as such, had any authority, by virtue of their office, to settle or attempt to settle any dispute between Grigson and Adams, and if they went to said store where Adams was for the purpose of settling or attempting to settle any such dispute, then you are instructed that, in so doing, they were acting wholly without their official duties and solely in their capacities as individuals.

"No. 7a. You are instructed that there is no evidence that Sheriff Barber and / or his deputy were or was acting in an official capacity when they went to the store where the shooting occurred, nor is there any proof that they or either of them were attempting to arrest the defendant; hence you are instructed that, in considering this case, you must look at it in the same way as if Lish Barber and Bob Smith were not officers.

"No. 7b. You are instructed that, if you find from the evidence that the sheriff and / or his deputy did not go into the store for the purpose of arresting the defendant for a felony, then you are instructed that the sheriff and / or his deputy had no other or better rights in said store at the time than any private individual.

"No. 8. You are instructed that the sheriff and his deputy had no right, under the law, to attempt to arrest the defendant for any disturbance or row the defendant may have had with Grigson prior to the time of the arrival of the sheriff or his deputy at the store where the shooting occurred, unless you find they had a warrant for him, and if they or either of them attempted to do so without a warrant, then you are instructed that in such attempt they were acting in violation of the law, and in violation of the rights of the defendant."

granted. The idea which these prayers were intended to cover, as stated in the former opinion, is as follows: "If the sheriff and his deputy were not acting in the capacity of officers of the law, with the right to so act, no account should be taken of the fact that they were officers. In other words, the fact that Barber and Smith were officers of the law was not a circumstance to be considered by the jury, unless the officers had the right to act in that capacity and were so acting." In thus granting appellant's prayers for instructions No. 7b and No. 8 at the last trial, the court fully and correctly covered the testimony adduced bearing upon that subject, and did not err in refusing appellant's prayers No. 7 and No. 7a, which concerned the same subject. Moreover, appellant's prayers for instructions Nos. 7 and 7a on the last trial were not correct either in form or substance. They were incomplete, and were argumentative in form because they unduly stressed particular phases of the testimony.

Appellant's prayer for instruction No. 18 is as follows:

"You are instructed that, in the event you find from the evidence there are two equally reasonable views of the evidence which may be adopted by the jury, one of which leads to the conclusion of guilt and one of which leads to the conclusion of innocence, and that the testimony tending to show each of said theories is of equal probability or truth, then you are instructed that it is your duty to adopt that view of the evidence that leads to the conclusion of innocence, and acquit the defendant."

Appellant's prayer for instruction No. 19 embodied the same idea and theory, and we therefore do not set it out.

Even if it could be said that this was a case depending wholly upon circumstantial evidence, nevertheless the court did not err in refusing to grant appellant's prayers for instructions Nos. 18 and 19, because the court had already fully and correctly instructed the jury on the

credibility of witnesses, the weight of evidence, the pre-sumption of innocence, and reasonable doubt. In *Barton* v. *State,* 175 Ark. 120, 298 S. W. 867, we said, referring to the refusal of the trial court to give a similar instruction:

"We have held, however, that it is not improper to refuse to give such an instruction, even in cases where conviction was asked wholly upon circumstantial evidence, where the jury was properly instructed as to the burden of proof resting on the State to establish the guilt of the accused beyond a reasonable doubt, and where reasonable doubt was properly defined. *Rogers* v. *State,* 163 Ark. 252, 260 S. W. 23; *Bost* v. *State,* 140 Ark. 254, 215 S. W. 615; *Cooper* v. *State,* 145 Ark. 403, 224 S. W. 726; *Cummins* v. *State,* 163 Ark. 24, 258 S. W. 622; *Barker* v. *State,* 135 Ark. 404, 205 S. W. 805; *Garrett* v. *State,* 171 Ark. 297, 284 S. W. 734; *Rogers* v. *State,* 163 Ark. 252, 260 S. W. 23."

The above correctly declares the law, and it is not in conflict with any of our previous decisions.

But the case at bar does not depend wholly, if indeed at all, upon circumstantial evidence. We regard it rather as a case where the guilt or innocence of the defendant depended upon the direct testimony of witnesses as to facts related by them and the weight and credibility to be given by the jury to the testimony of such witnesses. If we are correct in this conclusion, it would have been positive affirmative error for the trial court to give instructions Nos. 18 and 19. These instructions are wholly improper and erroneous, except in cases depending wholly upon circumstantial evidence, where the jury is to draw its conclusions only from circumstances and not from the direct evidence of eye-witnesses. The prayers for instructions Nos. 18 and 19, if granted in the case at bar, would have been argumentative, and calculated to confuse and mislead the jury. Therefore the court did not err in refusing them. The ruling of the court in refusing these prayers for instructions is in perfect accord with the doctrine of our cases as announced

in *Wacaster* v. *State,* 172 Ark. 983, 291 S. W. 85; *Garrett* v. *State,* 171 Ark. 297, 284 S. W. 734; *Cooper* v. *State,* 145 Ark. 403, 224 S. W. 726; *DeShazo* v. *State,* 120 Ark. 495, 179 S. W. 1012; *Rogers* v. *State,* 163 Ark. 252, 260 S. W. 23; *Cummins* v. *State,* 163 Ark. 24, 258 S. W. 622; *Barker* v. *State,* 135 Ark. 405, 205 S. W. 805—commented upon in brief of counsel for appellant. Indeed, we do not consider that the case of *Barton* v. *State, supra,* is out of harmony with our other cases when the facts of all these cases are differentiated and the law applicable thereto correctly apprehended. It is certain that appellant's prayers for instructions Nos. 18 and 19 are not applicable to the facts of this record, and the trial court did not err in refusing them.

Appellant's prayers for instructions Nos. 20 and 21 are as follows:

"20. You are instructed that evidence of good character, where introduced, is evidence in favor of the party possessing it, and, if believed by the jury, it goes to augment the presumption of innocence which the law raises on behalf of the defendant.

"21. You are instructed that defendant has introduced testimony tending to show he has, in the community in which he lives, a good reputation as a peaceable, quiet, law-abiding citizen (and that this evidence is substantive proof in defendant's favor), and must be considered by you in connection with all the other testimony in arriving at a conclusion as to the guilt or innocence of defendant."

These instructions are erroneous, and the court ruled correctly in refusing them. The court modified appellant's prayer for instruction No. 21 by striking out the words contained in the parentheses, and gave the instruction as thus modified, which ruling was according to the doctrine of this court as announced in *Eady* v. *State,* 168 Ark. 731, 271 S. W. 338.

3. The last contention of counsel for appellant is that the court made remarks during the trial, while the

testimony was being adduced, that were erroneous and prejudicial to appellant, and also that the court erred in allowing Congressman Tillman Parks, especially employed counsel for the prosecution, in the closing argument for the State, to make remarks concerning appellant's counsel and other remarks that were highly prejudicial to the appellant, and did not by its ruling remove from the minds of the jury the prejudicial effect of such remarks. We deem it unnecessary to catalogue and comment upon all the remarks that were made by the court and counsel. It is a complete answer to this assignment of error to say that the court told the jury, in express terms, not to consider at all any remarks made by the court during the taking of the testimony to which counsel had objected. These remarks, at least, were not of such a flagrant character as to produce any lasting impression in the minds of the jury prejudicial to the appellant. If they were calculated to prejudice appellant at all, the ruling of the court telling the jury not to consider them was sufficient to eliminate that prejudice.

Certain remarks were made by Parks concerning Jim Landis, counsel for the appellant, to the effect that the speaker had known him as a follower of the lowly Nazarene, and deploring the fact that, "on the threshold of a new career, he was enlisted in behalf of a man who was a murderer." Likewise Mr. Parks referred to Judge Carter's career on the circuit bench—how he then thundered against crime *et cetera,* but now he too was found on the side of one who had violated the law, as the speaker would have the jury infer. Mr. Parks alluded to an effort being made by the attorneys for the defendant, before Barber's body was placed in the ground, seeking evidence in his behalf. Among other things, Mr. Parks said that what took Bob Smith down to the Grigson & Adams store on the fatal day was, "O, the beckoning hand of duty, the silver hand of duty," and other similar remarks, which we deem it unnecessary to set forth and comment upon in detail. As soon as any objection was made to any of these remarks, the court

promptly admonished counsel that they were improper, and, in effect, to confine himself to the record, and instructed the jury not to consider these remarks.

Trial courts, in the very nature of the case, must be, and are, vested with wide discretion in determining whether the remarks of counsel in argument are within their legitimate scope, or whether they transcend the bounds set for them by the well established rules of practice which this court has so often announced to govern and guide trial courts in the matter of passing upon the arguments of counsel. Perhaps, the rule has never been better stated by any court than was stated by the Supreme Court of Wisconsin in *Brown* v. *Swineford,* 44 Wis. 282, 28 Am. Rep. 582, through its Chief Justice Ryan, and adopted by our own court in *Little Rock & Ft. Smith Ry. Co.* v. *Caveness,* 48 Ark. 106, 2 S. W. 505, and quoted by Judge BATTLE, speaking for the court in that case, as follows:

"The profession of the law is instituted for the administration of justice. The duties of the bench and bar differ in kind, not in purpose. The duty of both alike is to establish the truth and to apply the law to it. It is essential to the proper administration of justice, frail and uncertain at the best, that all that can be said for each party, in the determination of fact and law, should be heard. Forensic strife is but a method, and a mighty one, to ascertain the truth and the law governing the truth. It is the duty of counsel to make the most of the case which his client is able to give him, but counsel is out of his duty and his right, and outside of the principle and object of his profession, when he travels outside of his client's case and assumes to supply its deficiencies. Therefore is it that the nice sense of the profession regards with such distrust and aversion the testimony of a lawyer in favor of his client. It is the duty and right of counsel to indulge in all fair argument in favor of the right of his client, but he is outside of his duty and his right when he appeals to prejudice irrelevant to the case. Properly, prejudice has no more

sanction at the bar than on the bench. But an advocate may make himself the *alter ego* of his client, and indulge in prejudice in his favor. He may even share his client's prejudice against his adversary, as far as they rest on the facts in his case. But he has neither duty nor right to appeal to prejudices, just or unjust, against his adversary, *dehors* the very case he has to try. The very fullest freedom of speech, within the duty of his profession, should be accorded to counsel; but it is license, not freedom of speech, to travel out of the record, basing his argument on facts not appearing, and appealing to prejudices irrelevant to the case and outside of the proof. It may sometimes be a very difficult and delicate duty to confine counsel to a legitimate course of argument. But, like other difficult and delicate duties, it must be performed by those upon whom the law imposes it. It is the duty of the circuit courts, in jury trials, to interfere in all proper cases of their own motion. This is due to truth and justice. And if counsel persevere in arguing upon pertinent facts not before the jury, or appealing to prejudices foreign to the case in evidence, exception may be taken by the other side, which may be good ground for a new trial, or for a reversal of the court.''

The same great judge again voiced the unanimous opinion of this court in his own strong and lucid language, when he declared the proper practice for trial courts to follow in such cases in *Kansas City & C. R. Co.* v. *Sokal,* 61 Ark. 137, 32 S. W. 497. Again, Judge BATTLE, speaking for the court in *Holder* v. *State,* 58 Ark. 473, 25 S. W. 279, 281, at page 481, declares the rule and duty, particularly with reference to prosecuting attorneys, as follows:

''A prosecuting attorney is a public officer 'acting in a *quasi*-judicial capacity.' It is his duty to use all fair, honorable, reasonable and lawful means to secure the conviction of the guilty who are or may be indicted in the courts of his judicial circuit. He should see that they have a fair and impartial trial, and avoid convictions contrary to law. Nothing should tempt him to appeal

to prejudice, to pervert the testimony, or make statements to the jury which, whether true or not, have not been proved. The desire for success should never induce him to endeavor to obtain a verdict by arguments based on anything except the evidence in the case and the conclusions legitimately deducible from the law applicable to the same. To convict and punish a person through the influence of prejudice and caprice is as pernicious in its consequences as the escape of a guilty man. The forms of law should never be prostituted to such a purpose."

See *Vaughan* v. *State,* 58 Ark. 353, at page 368, 24 S. W. 885, where the rule is also announced. *Doran* v. *State,* 141 Ark. 442, at page 447, 217 S. W. 485. These rules have never been departed from. See *Kansas City Southern Ry. Co.* v. *Murphy,* 74 Ark. 256, 85 S. W. 428, where Chief Justice HILL, speaking for the court, clearly and cogently states the rules concerning remarks of counsel as they had been announced by this court in previous decisions to that date (1905), and in the opinion he collates all of our cases upon the subject. Again we may say here that there is no controversy or uncertainty as to the rules themselves, but the difficulty always is in their application to the facts of each particular case. That is the matter here which has given us very grave concern.

Now, it is sufficient to say of all the above and other similar remarks of Mr. Parks that they constituted improper argument; but, after he was so told by the court, it is exceedingly doubtful whether they had any effect on the minds of the jury prejudicial to the appellant. If so, we are convinced that the rulings of the court declaring them improper and directing the jury not to consider same removed all possible prejudice from their minds. The *ad captandum, ad hominem,* remarks of the Congressman, in which he turned from the facts and the law of the case to express his opinion of Mr. Landis and Judge Carter, of counsel for the defendant, because they had accepted employment to defend the accused, were, of course, highly improper, because his purpose was to

appeal to the passion and prejudice of the jury. But the court admonished counsel that such argument was improper, and that he should not make it. When the remarks themselves are analyzed, we discover nothing in them derogatory to the character of Mr. Landis or Judge Carter. These gentlemen were both doubtless as well known to the jury as they were to Mr. Parks. The jurors, as sensible men, would understand the relation that a lawyer sustains to his client and the duty he owes his client. No doubt a sensible, fair-minded jury would be quick to resent any remark which they regarded as a reflection on the character of these gentlemen, and especially upon the integrity and the eminent public service of their former circuit judge. They perhaps would regard as wicked and slanderous any remarks which they considered an aspersion upon Judge Carter and Mr. Landis, and would say, in answer to the offender, "his mischief shall return upon his own head and his unfair dealings shall come down upon his own pate," and he shall reap no benefit therefrom by our verdict.

When we consider therefore that the remarks concerning Judge Carter and Mr. Landis were but tantamount to the expression of an opinion, and that they were not derogatory in character, but rather the reverse, and that the attorney making them was admonished by the court that such an argument was improper, it is problematical whether such remarks, if they had any effect at all, did not in fact tend to influence the jury in favor of the appellant instead of against him. We have therefore reached the conclusion that the remarks of a personal nature, under the circumstances, had no prejudicial effect whatever upon appellant's rights. This court will always reverse where counsel go beyond the record to state facts that are prejudicial to the opposite party, unless the trial court, by its ruling, has removed the prejudice. *Hughes* v. *State,* 154 Ark. 621, 243 S. W. 70; *Hayes* v. *State,* 169 Ark. 1173, 278 S. W. 15; *Sanders* v. *State,* 175 Ark. 61, 296 S. W. 70. But this court does not reverse for the mere expression of opinion of counsel

in their argument before juries, unless so flagrant as to arouse passion and prejudice, made for that purpose, and necessarily having that effect.

After careful consideration of the whole record we find no error for which the judgment should be reversed. The same is therefore affirmed.