FRICK *v.* STATE.

Opinion delivered May 28, 1928.

*Gordon Frierson, R. V. Wheeler, John Cooper* and *Wils Davis,* for appellant.

*H. W. Applegate,* Attorney General, and *Darden Moose,* Assistant, for appellee.

WOOD, J. C. Frick was indicted by the grand jury of Crittenden County, Arkansas, for the crime of murder in the first degree in the killing of one Prentiss Hoop, by shooting him, in Crittenden County, Arkansas, on the 7th of June, 1927. The indictment was valid. The defendant was tried and convicted of the crime of voluntary manslaughter, and by judgment of the Crittenden Circuit Court sentenced to imprisonment in the State Penitentiary for two years, from which judgment he duly prosecutes this appeal.

1. The appellant contends, first, that there was no testimony to sustain the verdict. The testimony of Mack Hoop was to the effect that he and his brother, Prentiss Hoop, on the night of June 7, 1927, in Crittenden County, Arkansas, were bumming their way to the Kansas wheat fields. They caught a freight train on the Harahan bridge, and were riding between two box-cars. They rode about one hundred yards west, when two special agents of the railway company called, "Get off, you sons of b............., or we'll shoot you off." The Hoops jumped off the train, and started running down the embankment. One of the men who called to them fired two shots, one of which hit Prentiss Hoop in the back. Prentiss Hoop at that time was fifteen years old. Witness saw Mr. Carter down at the bottom of the dump, on the right-hand side. Carter was called by Guthrie, who stated that there was a boy dead up there. Witness and Carter went to the place, and found witness' brother dead. The train, at the time witness and his brother jumped off, was going west, and they jumped off on the north side. The men that did the shooting were on the walkway on the south side when they told them to get off the train. Witness recognized the defendant by his voice. Witness was interested in a suit that had been brought against the railroad company in Federal court in Memphis for the killing of his brother. There were two railway tracks on the bridge, and the train was on the south track and was going west. Witness saw the special agents when they said they would shoot them off. The train was moving slowly—about three or four miles an hour. Witness was running faster than the train was moving. Witness' brother was behind witness.

Pictures were introduced in evidence with the positions marked showing the location of the train on the bridge, the place where witness and his brother jumped off the train, and the positions of witness when the shots were fired. The shooting occurred on June 7, 1927, in Crittenden County, Arkansas.

Witness Guthrie testified, in substance, that he was the undertaker who took charge of the body of Prentiss Hoop on the night he was killed. His testimony shows that Hoop was shot in the back, three or four inches below the shoulder. The bullet, ranging downward, went through the body at an angle of about forty-five degrees. Witness found the body on the main trestle back towards the Mississippi River, about two hundred feet from the dirt dump on the Arkansas side. It was not a bright moonlight night, nor was it a real dark night. After being notified of the shooting, witness got to the place, and found the body thirty or forty minutes thereafter.

Charlie Martin, a negro, testified, on behalf of the State, that he had been working for the Frisco Railroad as a bridge tester for twenty-three years, and was on the Frisco trestle at the time Hoop was killed, about 150 yards south of the Harahan bridge and about 100 yards from where the shooting took place. Witness saw the shots fired. They were fired from the south side of the bridge next to the Frisco. Witness pointed out the defendant as the one who did the shooting. The Frisco bridge is lighted by electric lights all the way across. Witness was working on the Frisco bridge at the time. There were no electric lights where the shooting occurred. What light witness had came from right at the end of the bridge. The shooting occurred about two barrel lengths from the end of the bridge back toward Memphis—east. Witness heard somebody cursing before the shooting, and immediately after the cursing the shots were fired. The little man was the one who did the shooting. The witness, on cross-examination, finally stated that he would not say positively that the defendant was the man who did the shooting.

J. T. Carter testified that, on the night of June 7, 1927, he was out on the driveway of Harahan Park. He was sitting on the fence on the roadway, and heard some cursing and some one saying, ''Get off there, you sons of b................, or I'll shoot you off.'' He heard that

a couple of times, and two shots were fired. Witness noticed two men dressed in dark suits and two fellows running—the two shots were fired, and one of the fellows continued running down the hill. Witness flashed a light on him and asked him what the trouble was, and he said that the special agent shot at them. The train rolled on by. Witness saw a man on top of the train, and saw him with his flashlight down in the car after the shooting. Witness had seen two men before the shooting, and saw two flashes of the pistol. When the boy came down the hill, he said his brother was with him. Witness and boy walked up the hill together, and found the dead body of a young boy about fifteen or sixteen years of age. The train was running slowly when the shooting occurred. Witness' attention was drawn by the cursing and shooting. The train was then rolling. The body was found on the right-hand side of the track coming west.

Howard Curlin testified that he was a deputy sheriff of Crittenden County. On the morning of the next day after the shooting occurred and the defendants were brought over and put in jail, witness was talking to them at the jail. Both were present at the time the talking was going on. They were discussing the shooting, and the defendant Frick said that he did all the shooting—that Brownlow didn't fire a shot. He didn't have anything to do with it, except that he was present. The defendant Frick didn't say that he shot and killed the boy—he said he did all the shooting. The defendants voluntarily surrendered themselves to the sheriff of Crittenden County.

William Shoate, a witness for the State, testified that he was at his restaurant, which was about sixty feet from the Harahan bridge, on the night of the shooting. He was in his living room, at a table, playing solitaire, when he heard two shots, and jumped up and opened the door, and looked down toward the viaduct to see if there was any trouble down there. He heard loud talking on the bridge, and finally went up there. He saw

the body of Prentiss Hoop. Witness illustrated to the jury the location of the wound. The body was about six or seven steps from the dirt end of the bridge. It was a light night, and while the shooting was going on there was a motor-car, which operated on the Missouri Pacific and which had a very bright light, coming up the hill. It was going east.

W. D. Jones testified that he was collector on the viaduct, and was there the night the Hoop boy was shot. It was a bright night; the shooting occurred between ten and ten fifteen o'clock. Witness heard two shots, and saw one of them. He was looking right toward the railroad when the shots were fired—one right behind the other. Witness was right at the end of the viaduct, sitting with his back to the wall looking toward the bridge—he was right under the Frisco Railway trestle. He heard a shot, and looked up and say the flash of a pistol—the second shot. It was impossible to recognize any one at that distance. The man who did the shooting was on the south side, shooting north. The blaze went north. There was no train between witness and the flash which witness saw. Witness was sitting right under the Frisco bridge, looking north.

The testimony on behalf of the defendants tended to show that Frick and Brownlow were "train-riders" employed by the Missouri Pacific Railroad Company for the purpose of protecting the company's property, and it was their duty to ride merchandise train No. 265, leaving Memphis shortly after night each night to Wynne. From February 23, 1927, until June 7, 1927, there had been 23 box-car robberies between Memphis and Parkin, Arkansas, on trains out of Memphis. Frick and Brownlow had been riding this train—No. 265—each night from May 1 or 2.

Frick and Brownlow testified, in substance, that they were riding train No. 265 west on the night of June 7, 1927, and that, when the train stopped near the west end of the Harahan bridge, they got off the train about

thirty-five cars east of the engine, and started walking west toward the engine on the south side of the train, which was composed entirely of box-cars, except for two stock-cars next to the engine. They always walked toward the engine, as by so doing they could see objects between them and the engine in the light cast by the headlight and the fire-box. Frick saw two or three men standing on the south side of the train, apparently attempting to open the door to a car, and Frick called to Brownlow, who also saw the same thing. Each drew his pistol and ran toward the men, hollering. Frick shot two shots westward over the heads of the men, for the purpose of frightening them, and the men then ran westward toward the engine and disappeared. They discovered a car door which had been partially opened when they arrived at the place where the men were. Frick denied shooting north or at any man.

The defendant introduced a photographer, who identified pictures which he took purporting to illustrate the position of Carter and the cars, the defendants, and the Hoops, on the night Prentiss Hoop was shot. These pictures were in evidence.

Dr. McVey testified as an expert that, in his opinion, a man wounded as Prentiss Hoop was could only have taken one or two steps after being shot.

V. E. Murray testified, for the defendants, that he was acquainted with the general reputation of witness Carter for truth and morality, and that it was bad.

Learned counsel for the appellant contend that, under the above evidence, the court erred in not instructing the jury, at appellant's request, to return a verdict finding him not guilty. But the testimony speaks for itself, and is amply sufficient to justify the jury in finding that the appellant fired the shot that killed Prentiss Hoop.

2. The appellant requested the court to instruct the jury as follows: ''You are instructed that, in cases of circumstantial evidence, each and every circumstance must be proved beyond all reasonable doubt, and it must

show defendant's guilt beyond all reasonable doubt, and to the exclusion of every other reasonable hypothesis. In the cases of circumstantial evidence the circumstances must be shown to be consistent with the guilt of the defendant and wholly inconsistent with his innocence.'' Prayer No. 1 by the appellant was substantially to the same effect. The court refused these prayers for instruction. The appellant objected, and duly excepted to the ruling of the court in not granting same.

Counsel for the appellant assume that the State in this case relies for conviction wholly upon circumstantial evidence. But we are convinced that counsel are mistaken in this view of the evidence. It is not a case depending wholly upon circumstantial evidence. The jury might have found from the testimony of eye-witnesses that the appellant shot and killed Prentiss Hoop. Manifestly, the jury believed the testimony of the witnesses Carter and Martin, who saw the shots fired and saw the Hoops running, and also the testimony of Jones. Even the testimony of the appellant himself was to the effect that he fired shots, but that he fired above the heads of the fleeing men. It is not disclosed by the testimony that there were any other shots fired that night, so we have the direct testimony of eye-witnesses to the effect that they saw and heard the shots fired, that they were fired in the direction of the fleeing men, and that the man was found dead immediately after these shots were fired. Testimony of this nature could hardly be classified as wholly circumstantial, but it seems to us it was in the nature of direct testimony. Certainly, the most that could be claimed from a consideration of all the testimony in the record is that it consisted partly of direct and partly of circumstantial evidence. It occurs to us that it is a case where the ultimate fact to be proved depends more upon the credibility of the eye-witnesses than upon inferences to be drawn from collateral facts established by the direct testimony. It is not a case calling for the discussion of and the making of a nice discrimination

between direct and circumstantial evidence as these two kinds of evidence are defined by standard law-writers on evidence. For, as is said by Mr. Burrill in his work on Circumstantial Evidence, page 231, speaking of the relative value of direct and circumstantial evidence:

"They are in practice constantly found to occur in the closest connection; indeed, they are seldom wholly dissevered, especially so as to exclude the indirect species. It is very rare, as has been often remarked, that any body of evidence presented to the mind as the basis of a judgment is, on examination, found to consist wholly of direct, without any admixture of circumstantial, evidence. Finally, as thus associated, they are constantly found to be mutually consistent, and to cooperate toward the attainment of their common object, with the greatest harmony. That, indeed, may be pronounced the most perfect body of evidence in which strong direct testimony is sustained throughout by numerous and according circumstances." See also 1 Greenleaf on Evidence, § 13; Wills on Circumstantial Evidence, p. 16.

But, even if counsel were correct in assuming that this case depended wholly upon circumstantial evidence, there was no prejudicial error in the ruling of the court refusing the above prayers for instructions, since this court has ruled in numerous cases, some of them quite recent, that it is not error to refuse such an instruction, even in cases depending wholly on circumstantial evidence, where the court, in other instructions, has correctly defined reasonable doubt and declared the law applicable to that subject. The court in this case gave correct instructions on the subjects of presumption of innocence, burden of proof, and reasonable doubt. See *Adams* v. *State,* 176 Ark. 916, 5 S. W. (2d.) 946; *Barton* v. *State,* 175 Ark. 120, 298 S. W. 867, and cases there cited.

Furthermore, the instruction was inherently erroneous because it told the jury that it was necessary for the State to prove "each and every circumstance beyond all reasonable doubt." Such is not the law. It is sufficient

if the State proves the guilt of the defendant in the whole case beyond a reasonable doubt. *Lackey* v. *State,* 67 Ark. 426, 55 S. W. 213; *Cummins* v. *State,* 163 Ark. 24, 258 S. W. 622; *Sullivan* v. *State,* 163 Ark. 11, 258 S. W. 643; *Martin* v. *State,* 163 Ark. 103, 259 S. W. 6, 33 A. L. R. 133.

It appears from the bill of exceptions that the court correctly defined the degrees of homicide contained in the indictment, and in one of its instructions, after defining voluntary manslaughter, told the jury, if they found the defendant guilty of voluntary manslaughter, they should express that finding in their verdict and fix his punishment at imprisonment in the State Penitentiary at a period from two to seven years. The court directed the reporter to write out, to be given to the jury, the forms of the verdict for the different degrees of homicide included in the indictment, and the reporter, in writing out the forms, erroneously transcribed the form of the verdict for voluntary manslaughter by inserting the prefix "in" before the word "manslaughter." When the verdict was returned into court it expressed that the jury found the defendant guilty of involuntary manslaughter. The court thereupon asked the jury if it was their intention to return a verdict finding defendant guilty of involuntary manslaughter or voluntary manslaughter, and requested the jury, if it was their intention to return a verdict finding defendant guilty of voluntary manslaughter instead of involuntary manslaughter, to hold up their hands. All of the jurors, in response to the question of the court, held up their hands, thus affirming that it was their intention to return a verdict finding the defendant guilty of voluntary manslaughter. Thereupon the court, in presence of the defendant, his counsel, and all the jury, corrected the typographical error made by the court reporter, by striking from the form of the verdict the prefix "in" before the word "manslaughter" leaving the words "voluntary manslaughter," and asked each member of the jury, after the verdict was corrected and read as cor-

rected, if such were his verdict, and each replied in the affirmative. There was no error in this procedure. It was manifest that the word "involuntary" as originally written in the form of the verdict, was a clerical misprision of the court reporter, and that it was the intention of the jury to find the defendant guilty of voluntary manslaughter and to so return their verdict.

The record presents no error. Let the judgment be affirmed.