TILLMAN *v.* STATE.

4883                                          307 S. W. 2d 886

Opinion delivered December 23, 1957.

**434**

*Virgil Roach Moncrief* and *John W. Moncrief,* for appellant.

*Bruce Bennett, Atty. General* and *Thorp Thomas, Asst. Atty. General,* for appellee.

CARLETON HARRIS, Chief Justice. Appellant, John "Fifteen" Tillman, was indicted by the Grand Jury of Arkansas County (Northern District) for the crime of murder in the second degree, it being alleged that Tillman feloniously shot and killed one Madison Mayfield. On trial of the case, Tillman pleaded self defense, contending that Mayfield was attacking him with a knife at the time of the shooting. Appellant was found guilty of voluntary manslaughter, and his punishment fixed at

imprisonment for six years. From such conviction comes this appeal.

The facts, relating to the killing, briefly, are as follows. On the morning of May 12, 1956, sometime around 7 a.m., at a cafe in Stuttgart, a number of individuals were gathered together, engaged in drinking beer and whiskey. Among those present were Monk Bradford, Elizabeth "Eisenhower" Thomas, Clarice Caldonia Tate, Madison Mayfield, and the appellant. According to the State's evidence, during the drinking, Bradford and Tillman engaged in an argument over $.50 that Tillman contended was owed to him by Bradford; subsequently, Tillman left. Sometime later, Bradford, "Eisenhower", Mayfield, and Caldonia left from the back of the cafe, and entered into an alley, where they were standing when Tillman walked by, and engaged in some further argument with Bradford. Tillman had a 22 rifle without a stock, which was pushed down behind his belt, and partly covered by his shirt. He walked on and shortly returned, when, according to "Eisenhower", Tillman "* * * just came up and just shot." When asked what Mayfield was doing, she stated, "He wasn't doing nothing but standing up there looking at us." She saw no knife. Caldonia stated she heard Tillman say, "Don't come no further."[1] She saw no one with a knife. LeRoy Phillips testified that Bradford "backed" Tillman behind a car, and "* * * 15 went wild, and this other guy broke at him, and he shot him." He heard no argument between Tillman and Mayfield, and did not know whether the deceased had a knife. LeRoy Watson, who was washing his car, testified that Tillman walked up to the group, asked them what they were doing, and then started walking back toward witness' car. Both Bradford and Mayfield followed, and Tillman told them to get back or he would shoot — they "* * * kept going up on him" — and Tillman fired. Watson testified he first saw a knife when the coroner turned over the body.[2]

---

[1] It is not clear whether this remark was directed to Bradford, Mayfield, or both.

[2] The coroner testified that when he turned Mayfield's body over, he found a knife along about the waist.

According to the defendant's testimony, he had had no argument with Bradford whatsoever, but he testified that Mayfield had earlier, inside the cafe, drawn a knife on him;[3] later, he (Tillman) left the cafe and went to a grocery store to get some orange juice. According to his testimony, on the way to the grocery store, he found the gun that he subsequently used. "* * * I got it on my way to the Chinaman's. I was walking and I wasn't paying too much attention and there was something down there in some old cans and things besides Mr. Bloomfield's place when you go through the alley there to the Chinaman's, and that thing was laying down there in some old cans and things and I just picked it up. I didn't pay too much attention to it." After drinking the orange juice, he started back to another cafe. Interrogated as to when he first noticed Mayfield, he replied: "Well, I come on through that alley, him and Monk was standing up there in the alley right there by a water meter and I passed him and never said a word to neither one and so someone said, I heard someone say, "Look out, 15" and when I looked back he was coming behind me with the knife, trying to run up on me with a knife. I started to back up and I told him to get back. I just said, "Get back." Q. Did he get back? A. No, sir, he just kept acoming. Q. Was that when you threw the gun up and fired? A. Yes, sir. Q. Did he have anything in his hand when he was coming toward you? A. Yes, sir, he had that knife."

---

[3] From appellant's testimony: "A. I was standing out there back of Bud's, me and Edward Walker, and Joe Hamilton and Willie Ford came out the back door there and said, "Don't you know your woman from mine", and I said, "I didn't know it was your woman out there" and we were just kidding, and went on and he went on off and Mayfield came up with his knife and started towards me and Edward Walker got between me and him and I went on back in at Ed Brewer's. * * * Q. And after that time did you see him again and where and what were you doing? A. Edward Walker and I went in Bud's private and was standing there talking and he came in with the knife again and opened his pocket knife and when he started out after me, I went behind him, and I come behind him out at the side and back out the door and I went on and through the alley there, went through the alley and all the way through the alley there." The first instance was corroborated by one Willie Ford.

The evidence, as to the circumstances surrounding the killing, was conflicting, and it was within the province of the jury to pass upon the weight of such evidence. It was their duty to determine whether appellant left the cafe to obtain a weapon with the intention of then returning to further pursue the matter, or just conveniently found the loaded gun[4] in a pile of rubbish . . . whether deceased was involved in an altercation with appellant . . . which was the aggressor . . . whether the killing was necessary in self defense. The evidence was clearly sufficient to sustain the conviction.

Appellant argues that the Court erred in permitting the prosecuting attorney to read a portion of a written statement that the witness, Caldonia Tate, had previously made before him. The matter arose in this manner. The witness testified on direct examination that Tillman said, "Don't come any further." On cross examination appellant's counsel asked the witness if, in the earlier statement to the prosecuting attorney, she had not said that Tillman's statement was, "Don't come any closer." The prosecutor immediately contended that counsel gave the appearance of reading from the statement, and proceeded to read that portion of the statement himself. It might be said that the matter appears of no consequence. The witness had just testified from the stand as to what she heard said, and the reading of that portion of the statement added no weight to her testimony; actually, under the circumstances existing when Tillman allegedly made the remark, the phrases "Don't come any further" and "Don't come any closer" have practically an identical meaning. The witness subsequently testified that she did not remember which word she had used. We do not see that this occurrence could have swayed the jury in any manner or that appellant suffered any prejudice. Be that as it may, if this was error, it was cured by the court's statement to the jury, "Gentlemen of the Jury. You base your verdict on the testimony you hear here, and not on statements that are read." This admonition was reiterated before the witness left the stand.

---

[4] He testified that he did not load the gun.

It is next contended that certain remarks by the State's attorneys were highly prejudicial and constituted reversible error. In the opening statement, the deputy prosecuting attorney said: "Of course, Gentlemen, if Mayfield was here, we would know more about what happened, but Mayfield is not here to defend himself." In the closing argument, the prosecuting attorney said: "* * * but let me tell you though, under these circumstances, if you go out of this jury box and return a verdict of not guilty for this "Fifteen", if you do that, then sit down also and write him a license to kill and give it to him." Upon objection being made to this statement by appellant's counsel, the court pointed out, "He has a right to express his opinion as does the attorney for the defendant, but the jury is to try the case on the law and the testimony and not on the argument of the counsel on either side of the case. * * *"

The remarks objected to, were, of course, only opinions of the attorneys for the State. As was said in *Adams* v. *State*, 176 Ark. 916, 5 S. W. 2d 946: "This Court will always reverse where counsel go beyond the record to state facts that are prejudicial to the opposite party unless the trial court, by its ruling, has removed the prejudice. * * * but this court does not reverse for the mere expression of opinion of counsel in their argument before juries unless so flagrant as to arouse passion and prejudice, made for that purpose, and necessarily having that effect. * * *" In addition to the admonition by the court, it is obvious that the jury was not aroused or prejudiced by these remarks, since appellant received a comparatively light sentence.

Assignment No. 4 of error is based upon the court's action in permitting the coroner to testify regarding appellant's statement to him of how he (appellant) found the gun. Such testimony was as follows: "The defendant stated to me that an argument had resulted in this alley and he wanted to find something to use to defend himself and he said he thought he might find a stick, a club, or some other object, and in his search he happened to look in some short weeds or grass, and this rifle was laying there and that is how he found

it or came in possession of it." As was said in *Dearen* v. *State*, 177 Ark. 448, 9 S. W. 2d 30; "* * * It is always permissible to prove declarations and admissions against a person charged with an offense, if his declarations and admissions tend to show in any way his connection with the crime charged, or tend to prove his guilt. * * *" The admissibility of such evidence has been upheld in numerous other cases.

Appellant filed an affidavit setting forth that he owned no property of any kind, had no means with which to pay court costs, and asked that complete transcript be furnished for appellant at the cost of Arkansas County. A hearing was conducted, at the conclusion of which, the court overruled the motion to require the county to pay the costs of the appeal, stating, "After hearing all of the evidence, I cannot see that he would qualify as a pauper. It has been proven that he makes around $50 a week, * * *." We agree entirely with this finding of the trial judge.

The appellant received a fair trial, and no reversible error appearing, the judgment is affirmed.