McMillan *v.* State.

4894                                          314 S. W. 2d 483

Opinion delivered June 23, 1958.

George E. Pike, Peyton D. Moncrief, Virgil Roach Moncrief and John W. Moncrief, for appellant.

Bruce Bennett, Atty. General, and Clyde Calliotte, for appellee.

CARLETON HARRIS, Chief Justice. Appellant, Woodrow McMillan, was charged with murder in the first degree, and upon trial, was convicted of second degree murder and given a sentence of twelve years. The killing occurred shortly after midnight, March 3, 1957, and McMillan pleaded self defense. From such conviction, he brings this appeal.

According to the evidence, Carl McCown and wife operated a cafe located near the court square in DeWitt. McCown and appellant were in the cafe with others around 10 p. m., and McCown suggested that the group go to his home for a dice game. McMillan went along, and in the game lost what money he had, gave McCown a check for $10, and also lost that. After the game closed, the group returned to the cafe, and McCown parked his car at the back of the establishment. Subsequently, he went to his car, and McMillan later went and sat in the car with him. An argument ensued relative to the check which McMillan had given McCown, it being contended by appellant that the former had told him he would return the check. Appellant had in his possession a 22 calibre pistol. The parties subsequently got out of the car, and McCown started toward McMillan, either to strike him, or to get the gun. McCown knocked the first shot upward but McMillan continued to fire until the gun snapped. The magazine held nine

cartridges, and it later developed all were fired except one. McCown ran into the street, and fell dead, being hit by three bullets.

Numerous assignments of error are set forth in the motion for new trial, the first three questioning the sufficiency of the evidence. Proof on the part of the State showed that appellant went to his pickup truck and got the pistol before going to the "crap" game. On returning to the cafe, McMillan talked to different ones there, and then went out to McCown's car. According to the State's evidence, McMillan fired the first shot from the back seat of the automobile, and one Chester Edmondson testified as follows:

"I didn't pay too much attention as to who was in the car until I heard McCown say, put that gun down.

Q. Was there any loud talking?

A. No, they wasn't talking very loud.

Q. Now, when you saw McCown get out of the car was there anything in his hand?

A. No, sir, I didn't see anything.

Q. If he had of had anything in his hand could you have seen it?

A. Yes, sir, if it was very big.

Q. Then you could see his hands?

A. Yes, sir.

Q. Did he have any weapon in his hand?

A. I didn't see one.

Q. Now, after this shooting had taken place and after McCown started staggering away from McMillan, what did Woodie do?

A. He shot three or four more times."
The deceased's wife, Mildred McCown, testified:

"I went on about my work, and I heard something and I thought it was a firecracker at first so I went

to the front door and looked, and when I went to the door, Woodie had done got out of the back seat and the door was open, and Lewis Carl got out on the same side that Woodie got out on, and so Lewis Carl started toward Woodie and Woodie shot, and Lewis Carl hit his hand and knocked his gun up and the shot went up, and Woodie shot several times at Lewis Carl, and Lewis Carl had turned after he shot him with the first shots and he was running down the road, and I went to Woodie and tried to get the gun and Woodie just kept shooting Lewis Carl, and Lewis Carl fell right on his face, and he was dead by the time I got to him.''

Charles Tiner, Chief of Police at DeWitt, stated:

''I went back to the police car, and I asked Woodie did he shoot Lewis, and he said yes, and I asked him why and he said he was tired of him running over him, and I asked him did he mean to kill him, and he said yes, he was tired of him running over him.''

Further testimony on the part of the State was to the effect that McCown was unarmed. The above enumerated testimony, if believed by the jury, was certainly sufficient to sustain a conviction for second degree murder. As stated in *West* v. *State,* 196 Ark. 763, 120 S. W. 2d 26:

''There is ample evidence to support the finding of the jury. Under the settled rules of practice the jury is the judge of the credibility of the witnesses and the weight to be given to their testimony, and it is also a well-settled rule that the evidence admitted at the trial will, on appeal, be viewed in the light most favorable to the appellee, and if there is any substantial evidence to support the verdict of the jury, it will be sustained.''

Numerous other cases denote the same holding.

By assignment No. 4, appellant contends that it was error for the court to fail to sustain his objection to a statement made by the prosecuting attorney during the State's closing argument, and that such statement was inflammatory and prejudicial to him. The statement ob-

jected to was ". . . if you turn him loose, then let him go out and kill someone else for a $10 worthless check . . .". Following this remark and an exchange of comment between the prosecutor and appellant's counsel, in which a derogatory remark, unconnected with the evidence, was made by defense counsel concerning the deceased, the court admonished the jury, stating:

"These statements are improper to make before a jury as they are not any part of this law suit and the jury is not to consider them. The Prosecuting Attorney has a right to express his opinion in the argument of this case as does the attorney for the defendant, but the jury is to try this case on the law and the testimony and not on the argument of counsel."

In *Adams* v. *State,* 176 Ark. 916, 5 S. W. 2d 946, this Court said:

"This Court will always reverse where counsel go beyond the record to state facts that are prejudicial to the opposite party unless the trial court, by its ruling, has removed the prejudice * * * but this court does not reverse for the mere expression of opinion of counsel in their argument before juries unless so flagrant as to arouse passion and prejudice, made for that purpose, and necessarily having that effect. * * *"

See also *Tillman* v. *State,* 228 Ark. 433, 307 S. W. 2d 886.

Several assignments of error deal with the court's refusal to sustain objections to the testimony of Russell McCollum, Coroner of Arkansas County. McCollum's testimony dealt with statements made to him by appellant a short time after the killing. We do not agree that this was error. As stated in *Dearen* v. *State,* 177 Ark. 448, 9 S. W. 2d 30:

"* * * It is always permissible to prove declarations against a person charged with an offense, if his declarations and admissions tend to show in any way his connection with the crime charged, or tend to prove his guilt. * * *"

A long line of Arkansas cases hold likewise. According to the evidence, the statements made by appellant to McCollum were voluntarily made, and in fact, it is not contended otherwise, except that appellant testified he was nervous and upset at the time the questions were asked. Appellant objected to each question propounded to the coroner and answer given, contending that McCollum was actually conducting an inquest, and had not complied with the statute governing such hearings. It is specifically contended that the statute was not complied with in the following respects: no jury was summonsed as required by Sec. 42-302, Ark. Stats. (1947) Anno., and the testimony was not reduced to writing as required by Sec. 42-307. Let it first be said that the interrogation of appellant by the coroner does not reach the dignity of a formal hearing. According to appellant's own testimony, he was not sworn, and there was no semblance of a ''hearing'' as the word is commonly used. In other words, no inquest was held. There was no occasion for a hearing, since appellant freely admitted the killing. It is true that certain declarations against interest were made by appellant during the questioning, but, as stated, the evidence reflects these statements were voluntarily made. Appellant also contends that he was not warned that anything he might say could be used against him. While it is preferable that the accused be so advised, the failure to do so does not invalidate a confession. The situation here is analogous to the situation in the early case of *Wilson* v. *United States,* (which was originally tried in the Western District of Arkansas) found in 162 U. S. 613, 16 S. Ct. 895, 40 L. Ed. 1090. There, Chief Justice Fuller, speaking for the Court, said:

''In short, the true test of admissibility is that the confession is made freely, voluntarily and without compulsion or inducement of any sort.

The same rule that the confession must be voluntary is applied to cases where the accused has been examined before a magistrate, in the course of which examination the confession is made, * * *.

\* \* \* where the accused is sworn, any confession he may make is deprived of its voluntary character, though there is a contrariety of opinion on this point. \* \* \* The fact that he is in custody \* \* \* does not necessarily render his statement involuntary, \* \* \*. And it is laid down that it is not essential to the admissibility of a confession that it should appear that the person was warned that what he said would be used against him, but on the contrary, if the confession was voluntary, it is sufficient though it appear that he was not so warned. \* \* \*

In the case at bar, defendant was not put under oath, and made no objection to answering the questions propounded. The commissioner testified that the statement was made freely and voluntarily, and no evidence to the contrary was adduced. \* \* \*''

There was no error in admitting the testimony of the coroner.

It is next contended the court erred in giving certain instructions and refusing to give others requested by appellant. We have examined all the instructions, offered, refused, and given, and we find no error committed by the court as against the objections made.

Appellant's main argument for reversal is based upon remarks made by the trial court in the presence of the jury concerning certain evidence offered by appellant with reference to an infected or diseased ear, with which he allegedly was afflicted, and it is further contended that the court erred in refusing to permit several witnesses to testify relative to such physical condition. We will first discuss the latter contention. Five witnesses had previously testified regarding the condition of McMillan's ear, and appellant offered in evidence a notice from the Veteran's Hospital to appellant, directing that McMillan report back for further examination. The court correctly excluded this exhibit, as it was not in proper form for introduction, and then announced:

''All right, but let me state further, Mr. Moncrief, that the Court does not think that it is necessary to in-

troduce any further testimony on the ear matter and that the testimony has just been cumulating in this case, so the Court will not allow anymore testimony pertaining to the ear matter.

Mr. Moncrief: Note the defendant's exceptions. If the court please, since the jury are laymen and might not understand the use of the word cumulating, I wish you would explain it to them.

The Court: That means the same kind of testimony just piling up witness after witness about the same thing.

Mr. Moncrief: If I understand the court correctly, the trial court has a right to say you should or should not call but so many witnesses to testify about one certain thing.

The Court: Yes, that is correct. It is just like if you were trying to prove someone's reputation. You might have a thousand witnesses to testify as to their reputation, but who would want to sit here and hear a thousand witnesses testify about the same thing, so the courts hold that a trial court has a right to make a reasonable limit on those kind of witnesses so that is the reason for my actions.''

Appellant contends that this was error, but we do not agree. In *Sheppard* v. *State,* 120 Ark. 160, 179 S. W. 168, Justice KIRBY, speaking for the court, said:

''It is next contended that the court erred in refusing to allow the ten other witnesses produced to testify in support of the alibi. Their testimony would have been cumulative, and it is not disclosed that any of said witnesses had any special or peculiar knowledge that would have tended more strongly to convince the jury of the truth of their statements of the whereabouts of appellant than that already given by the numerous witnesses who had testified, nor that any of them were of such standing that their statements would have carried more weight than that of the others, and the court did not err in refusing to permit them to testify. It is with-

in the sound, judicial discretion of the trial court to limit the number of witnesses permitted to testify about a particular fact and to decide where and when the introduction of cumulative testimony shall stop and, while in capital cases this discretion should be cautiously exercised, it will not be controlled unless it appears to have been manifestly abused."

We think it was sufficiently established that appellant had been suffering with some sort of ear infection, and additional testimony upon the subject would have been entirely cumulative.

We come now to a discussion of appellant's contention concerning the remarks by the court. The first witness offered by the defendant, John Varnadore, was asked the question:

"Do you remember what his physical condition was with reference to any ailment?

Mr. Lee: I object to this, he is no doctor.

The Court: I don't see that it has anything to do with it.

Mr. Moncrief: It has a great deal to do with it. We have heard as to the relative sizes of these men so we want to show the physical condition of these men, or of Mr. McMillan, that is."

The court permitted the question, and subsequently in the examination, another question was asked relative to the ear.[1] Upon objection by the State, the court invited appellant's counsel to explain his theory.

"Mr. Moncrief: Just this, if a man is assaulted and he is a normal person, that person might be able to withstand an assault or blow, but if he is a person that is not normal and has a dangerous condition about him that is susceptible to a blow that would either kill him or cause him great bodily injury, he would certainly

---

[1] Varnadore's testimony about the ear was as follows: "The ear drained and it would sometimes drain down on his shirt and he would have to keep putting cotton in his ear, and he would have to do that three or four times a day. * * * Yes, there seemed to be blood and pus."

have a right to defend himself against any assault that he, in good faith, believes would do him great bodily injury, and he, the defendant, would certainly have the right to protect himself under those circumstances, as we expect to prove in this instance. If a man is not able to withstand blows, he would fear blows if he was in such a condition that would cause great injury to him. The defendant's case has to be viewed from the standpoint from what his belief is so long as he acts as a reasonable person would under the same similar conditions.

The Court: I understand what you are trying to prove, but you are going too much in detail about his conditions. We are not trying a personal injury suit. I don't mind you laying the foundation what you are trying to prove, but you are going in too much detail."

McMillan testified he had had trouble with his ear for a year or two before the killing, and that it had constantly bothered him; that he had received treatment for the ear condition from different doctors in DeWitt, and had gone to the Veteran's Hospital in Little Rock, but had not been able to obtain relief. He testified his condition grew worse,[2] and the court remarked:

"Let's not go into much detail about that, Mr. Moncrief. This is not a personal injury suit, and I can't see where it would be competent in a criminal suit, and I don't think, by going into all of the details, that it would shed any light on the case.

Mr. Moncrief: Note the defendant's exceptions.

Q. If your Honor please, I would like to ask this question, whether or not, after an x-ray examination was done, and what were the results to him and whether or not he would withstand a blow if the blow happened to fall on the left side of his head. We want to show that he did undergo this operation and that the bone was affected in the area of the left ear and that it left a condition that he believed he couldn't withstand a blow that

---

[2] McMillan's foster mother testified there was a discharge from his ear with "an awful odor" which she would help clean out.

might happen to fall on the area of the left side of the head. * * *

The Court: I will let the record show that this ear was in a condition, but I cannot see that it would be competent, you can save your exceptions if you want to. You have shown what you wanted to.

Mr. Moncrief: I cannot state it in detail as to the removal of the bone in the ear and the fact that skin was taken from one part of his body and put on a part of his ear in order to protect the bone.

The Court: You have certainly got it in the record now.

Mr. Moncrief: If the Court please, I would like to go in chambers and make the available proof. We are asking that the available proof be made in the absence of the Jury if it is not allowed to make the available proof before the Jury.

The Court: Overruled, save your exceptions.

Mr. Moncrief: Note the defendant's exceptions. May I ask this, if the Court please, that if he had a fear that a serious blow to his ear or the area of the ear or the head might likely result in a great bodily injury to him or result fatal to him.

The Court: I don't think that would be competent, Mr. Moncrief.''

It would appear that counsel's contention was conveyed to the jury, but this, of course, did not constitute evidence. In several instances, questions relating to the ear were properly ruled inadmissible; for instance, Lem Burton was asked the question: ''In going fishing and hunting with McMillan, was he more careful than you in dodging limbs and bushes?'' Any answer, of course, by the witness, would have been pure opinion. We are of the view however, that competent evidence as to appellant's physical condition was proper and relevant. He was entitled to show his physical, as well as mental, condition at the time of the offense charged. As stated in *Sage* v. *State,* 91 Indiana 141:

"Independently of any question of insanity, the defendant in a criminal cause has the right to have his general physical as well as his mental condition at the time of the commission of the supposed crime explained to the jury, so as to put them in possession of all the facts connected with the transaction, and the better to enable them to judge of its character."

Also, in *Rector* v. *State*, 11 Ala. App. 333, 66 Southern 857:

"If the deceased had in fact recently been ill, it was a circumstance the jury could look to, in connection with all the other evidence in the case, in determining whether or not the deceased assaulted the defendant, and, if so, in determining the character and nature of the assault."

Such a conclusion is logical, for it might well be that one physically incapacitated would hesitate far longer to precipitate an altercation than one who is sound in body; at least, the jury was entitled to take into consideration such fact during their deliberations, as relating to the possible aggressor. Since we consider such evidence competent, it definitely appears that the remarks of the Court amounted to comment upon the weight of the evidence. On two occasions, the Court, though admitting the evidence, stated: "This is not a personal injury suit," and three times made remarks to the effect that the Court did not consider the evidence competent or relevant. It must be remembered that many jurors are serving for their first time, but, for that matter, even though they have served numerous times, the attitude, statements, and opinion of the court probably make a more indelible impression upon the mind of the juror than any other factor during a trial. To the jury, his word is the law. As stated by the late Justice BUTLER in *Western Coal & Mining Company* v. *Kranc*, 193 Ark. 426, 100 S. W. 2d 676:

"Because of his great influence with the jury, he should refrain from impatient remarks or unnecessary comments which may tend to result prejudicially to a litigant or which might tend to influence the minds of

the jury. By his words or conduct he may, on the one hand, support the character and weight of the testimony, or may destroy it in the estimation of the jury. Because of his personal and official influence, uncalled for or impatient remarks, although not so intended by him, may give one of the parties an unfair advantage over the other.

The remarks indulged in by the trial court in the instant case to our minds had the effect of minimizing the value of the evidence admitted.  *   *   *''

Likewise, as stated by the beloved Judge Battle,  in *Sharp* v. *State,* 51 Ark. 147, 10 S. W. 228:

"In the midst of doubt as to what their verdict should be as to appellant, it was natural for them to seize upon and adopt any opinion which they understood the judge to have expressed or intimated upon the questions they were required to decide.  *   *   *''

Clearly, the remarks of the court intimated that the evidence was of little, if any, value. While we recognize that no partiality or prejudice was intended by the remarks of the court, such remarks could have been damaging to appellant's plea of self-defense.

Numerous other errors are alleged, but we find no merit in such allegations.

Because of the error herein set out, the judgment is reversed, and the cause remanded.