STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v.
WAYNE FAUNTLEROY, DEFENDANT-APPELLANT.

Argued November 6, 1961—Decided January 22, 1962.

382

Mr. *Peter M. Adubato* and Mr. *John A. Marzulli* argued the cause for the appellant.

Mr. *Van Y. Clinton,* Assistant Prosecutor of Essex County, argued the cause for the respondent (*Mr. Brendan T. Byrne,* Essex County Prosecutor, attorney; *Mr. Peter Murray,* Assistant Prosecutor, on the brief).

The opinion of the court was delivered by

JACOBS, J.  The defendant was convicted of murder in the first degree and was sentenced to death. He appealed to this court as of right. See *R. R.* 1 :2–1(c).

On Thursday, July 28, 1960, shortly before 6 :00 P. M. the body of Beatrice Linkhorn was discovered in her apartment at 2 Stratford Place, Newark, by Reverend Wagner, Mrs. Hamilton and Mr. Marshall. Mr. Wagner was minister at the church where Miss Linkhorn was employed as teacher and secretary, Mrs. Hamilton was a life-long friend of Miss Linkhorn, and Mr. Marshall was superintendent of the apartment building at 2 Stratford Place. Miss Linkhorn's body was face down on the floor between her bedroom and living room. It was unclothed except for a pajama top which had

been pulled up around her shoulders. A pair of panties, a sanitary napkin and the support for the sanitary napkin were under the body or nearby. When the body was turned over a towel was found wrapped around the neck. It had been used to strangle Miss Linkhorn. The Chief Medical Examiner for Essex County testified that her death "was due to asphyxiation caused by strangulation with a ligature."

After the discovery of the body, Mr. Marshall went to call the police while Reverend Wagner and Mrs. Hamilton waited in the hallway outside Miss Linkhorn's apartment. Mrs. Hamilton was obviously distraught and was sobbing. At that time the defendant, who lived at 2 Stratford Place in an apartment across the hall from Miss Linkhorn's apartment, came over to Reverend Wagner and asked what was wrong and whether he could help. The Reverend told him that nothing was wrong and that Mrs. Hamilton was "just a little upset." At about 6:00 P. M. Officers Harper and Hall, of the Newark Police Department, arrived at the scene and 15 minutes thereafter Detectives Critchley and Adams arrived. Detective Adams spoke to Reverend Wagner and Mrs. Hamilton as well as to the defendant, called the record bureau of the City of Newark, and, after consulting with Detective Critchley, took the defendant into custody. The defendant was told by Detective Adams that he was being held as a "material witness," and on "a possible wanted sticker" from Springfield. At about this time Sergeant Buerle and Detective Leonardis of the Newark homicide squad reached the scene and "took over the investigation."

The defendant was taken to police headquarters at about 7:00 P. M. and was questioned there by Sergeant Buerle. The sergeant testified that his questioning began at 9:00 P. M. and "went to a half hour at the most" and that during its course he asked the defendant to take his clothes off. The defendant testified that his questioning during the evening of Thursday, July 28 lasted about 15 minutes, that he took all of his clothes off, that all of his clothes with the exception of his pants were returned to him, that he was not abused

at that time although he was given nothing to eat, and that after his questioning he was taken to the "detention cell" which he said was occupied by two other prisoners and which he described as a cell 12 by 4½ feet with a sink, toilet and a bench that is strapped to the wall but without a bed. The sergeant disputed the defendant's testimony that his pants were not returned on Thursday evening; he stated that they were returned to him then but that on the following morning the defendant was brought from the detention cell to the interrogation room where his pants were taken for purposes of examination and that the defendant was given another pair of pants to wear in the meantime. The defendant testified that on Friday morning and afternoon he was questioned for several hours, that he was physically mistreated by the police officers and was called vile names, that Detective Leonardis "took a pocket knife and scraped underneath my fingernails," that all he had to eat during the morning was "a cup of coffee and a stale roll," and that all he had to eat for lunch was a cup of coffee and a bologna sandwich and the same for dinner.

The officers denied that they had physically mistreated the defendant or had called him vile names. They acknowledged that on Friday they had interrogated him on several occasions but their testimony indicated that each interrogation was limited in time and was for a specific purpose connected with the furtherance of their investigation. Thus Sergeant Buerle testified that, at the first interrogation on Friday, the defendant's pants were taken for analysis which disclosed bloodstains in the area of the fly and crotch. He testified that during later interrogations on Friday the defendant's shoes were taken for analysis and further inquiries were made with respect to the defendant's "actions and where he worked and background." The sergeant disputed the defendant's testimony that Detective Leonardis had scraped his fingernails; he testified that, pursuant to their request, the defendant scraped them himself and that the fingernail scrapings were placed in an envelope and sent for analysis which dis-

closed evidence of blood. The sergeant testified that so far as he could recall nothing significant was found on the defendant's shoes and they were returned to him "some time Friday afternoon."

The defendant testified that on Saturday morning he had "a cup of coffee and a stale roll" and that he was questioned Saturday morning and again during Saturday afternoon. He testified that he was "confronted with the fact that they said that they had found bloodstains on my pants and fingernail scrapings" and that he "suffered the same sort of brutality but a little more of it and a little bit longer that Saturday afternoon." He stated that he had a cup of coffee and a bologna sandwich for lunch and the same for dinner. Sergeant Buerle acknowledged that the defendant was questioned Saturday morning but indicated that he knew nothing about any Saturday afternoon questioning. According to the testimony of Detective Meagher of the Essex County Prosecutor's office, the interrogation of the defendant on Saturday morning lasted about "an hour and a half or two hours." The defendant testified that he was again questioned on Sunday, that this questioning started about 1:00 p. m. and "lasted to well after 3:00 o'clock or going on 4:00 o'clock." The questioning was done by Detectives Leonardis and Scurese. Detective Scurese testified that after an hour and a half of questioning the defendant asked for a piece of paper and pencil and "requested to be left alone." He was left alone and when the detective returned, the defendant gave him a statement, in his own handwriting, which set forth that on Wednesday morning, July 27, he went to see the decedent, she answered the door and they talked for a few minutes, they "got into an argument" and "the next thing I remember is that she was laying on the floor dead and I had a towel in my hand." In explanation of the circumstances preceding this statement the defendant testified that he had "suffered the same sort of brutality" he had suffered during the preceding days and that Detective Scurese had said they were tired of the questioning and

wanted a confession and had placed a cord around his neck and told him that if he didn't write a confession "when I come back I will put this cord around your neck and I will not only hurt you, I will hang you with it" and "call it suicide." In his testimony, Detective Scurese expressly denied this alleged occurrence or that the defendant had in any manner been threatened or abused. Detective Leonardis did not testify because of illness.

On Monday morning, August 1, the defendant was questioned again and during the afternoon he was brought to 2 Stratford Place where photographs were taken. Sergeant Buerle testified that the defendant told him and the other officers present about his actions on July 27 and was photographed while pointing to particular locations in and about the apartment. The defendant disputed this testimony and stated that he was taken to the apartment and was told to assume certain poses and to point to various objects while he was being photographed. He acknowledged that he was not physically abused during the taking of the photographs or during the questioning which followed when he was returned to police headquarters. At that time, according to the testimony of Detective Meagher, the defendant was asked whether he was willing to make a written statement, said he was, and was advised by Sergeant Buerle that anything he said could be used against him in any further court proceedings. Detective Meagher stated that "Detective Leonardis typed the answers and they were put down in narrative form and the statement was signed by the defendant." The statement sets forth that the defendant entered Miss Linkhorn's apartment through a window after he had raised the screen, that when Miss Linkhorn saw him "she started hollering" and walking towards him, that he picked up a bottle from the corner of her dresser and threw it at her and that he "grabbed a towel from a door knob" and when she got by him he "grabbed a hold of her and some way or other" he "got the towel around her neck" and the next thing he remembered was that she was "laying

on the floor" and he tried to wake her by shaking her and "she was laying face down." In his testimony during the trial the defendant denied that he killed Miss Linkhorn or that he was ever in her apartment. In explanation of his signing the aforementioned statement he testified that he "wanted to get out from headquarters," from what he "was underneath" and that he figured that once he "got away from down there" and into court he "knew that there would be no chance for them to put a finger on me then."

At the trial, counsel moved to exclude the defendant's statements from evidence on the ground that the State had not established that they were voluntary within the principles recently expressed by this court in *State v. Smith,* 32 *N. J.* 501 (1960), *cert.* denied 364 *U. S.* 936, 81 *S. Ct.* 383, 5 *L. Ed.* 2d 367 (1961). See *United States ex rel. Smith v. State of New Jersey,* 194 *F. Supp.* 691 (*D. N. J.* 1961). There Justice Hall reviewed fully the pertinent considerations and authorities. He pointed out that while the public interest requires that the interrogation of persons in custody be not wholly forbidden, it is vital under our constitutional concepts that it be kept within proper limits and be conducted fairly and with due regard for the rights of the persons interrogated. See 32 *N. J.,* at *p.* 534; *cf.* "Police Interrogation Privileges and Limitations: An International Symposium," 52 *J. Crim. L., C. & P. S.* 1–74 (1961). He further pointed out that while earlier New Jersey cases generally took the position that a confession would be deemed voluntary so long as it was not extorted by threat or violence nor obtained by any direct or implied promise relating to some benefit to be derived by the accused in the criminal proceeding (see *State v. Cole,* 136 *N. J. L.* 606, 611 (*E. & A.* 1948), *cert.* denied 334 *U. S.* 851, 68 *S. Ct.* 1503, 92 *L. Ed.* 1773 (1948), petition for rehearing denied 334 *U. S.* 862, 68 *S. Ct.* 1519, 92 *L. Ed.* 1782 (1948)), later New Jersey cases have expressly recognized that confessions may be rendered inadmissible by conduct which is fundamentally unfair even though the

confession is truthful and is unaccompanied by promise, threat or violence. See *State v. Cooper*, 2 *N. J.* 540, 558 (1949); *State v. Pierce*, 4 *N. J.* 252, 258 (1950).

In *State v. Cooper, supra*, Justice Heher noted that while a confession freely given and "uninduced by either hope or fear or other consideration leading to the substitution of something else than the truth," may be wholly trustworthy, nevertheless under the Fourteenth Amendment, trustworthiness itself is not enough for there must be observance of "that fundamental fairness essential to the very concept of justice." See 2 *N. J.*, at *p.* 558. And he cited *Watts v. Indiana*, 338 *U. S.* 49, 69 *S. Ct.* 1347, 93 *L. Ed.* 1801 (1949); *Harris v. South Carolina*, 338 *U. S.* 68, 69 *S. Ct.* 1354, 93 *L. Ed.* 1815 (1949); and *Turner v. Pennsylvania*, 338 *U. S.* 62, 69 *S. Ct.* 1352, 93 *L. Ed.* 1810 (1949), where the Supreme Court reversed state convictions upon its finding that the prolonged secret questioning there presented was inherently coercive and that the resulting confessions, whether or not true, were to be deemed to have been obtained unconstitutionally. In the *Watts* case there was relay questioning for over three hours on the first day of detention and for over nine hours on each of four of the five succeeding days. In the *Harris* case there was relay questioning in a hot cubicle throughout one evening and for over 11 hours (with a one hour respite) during the next day and then for over six hours on the following day when the confession was made. In the *Turner* case the defendant was arrested without a warrant, was not promptly arraigned before a magistrate for a preliminary hearing as required by state statute, and was detained for five days before he confessed. He saw no visitors, was not informed as to his right to remain silent, and was questioned in daylight and evening hours, sometimes by one and sometimes by several officers. His total interrogation exceeded 23 hours and on each of two days he was questioned for a total of six hours in two separate sessions. As in the *Watts* and *Harris* cases the Supreme Court found that Turner's confession had been

obtained "under circumstances which made its use at the trial a denial of due process." See 338 *U. S.*, at *p.* 65, 93 *L. Ed.*, at *p.* 1813. See also *Fikes v. Alabama,* 352 *U. S.* 191, 77 *S. Ct.* 281, 1 *L. Ed. 2d* 246 (1957), petition for rehearing denied 352 *U. S.* 1019, 77 *S. Ct.* 553, 1 *L. Ed. 2d* 561 (1957).

Since *Watts, Harris* and *Turner,* the Supreme Court has frequently reviewed the admissibility of confessions which were obtained by allegedly unconstitutional means. The cases may be found collected in the recent opinions of Chief Justice Warren in *Spano v. New York,* 360 *U. S.* 315, 79 *S. Ct.* 1202, 3 *L. Ed. 2d* 1265 (1959) and *Blackburn v. Alabama,* 361 *U. S.* 199, 80 *S. Ct.* 274, 4 *L. Ed. 2d* 242 (1960), and in the later opinion by Justice Frankfurter in *Culombe v. Connecticut,* 367 *U. S.* 568, 81 *S. Ct.* 1860, 6 *L. Ed. 2d* 1037 (1961). In *Blackburn* the Chief Justice pointed out that the Fourteenth Amendment forbids "fundamental unfairness in the use of evidence whether true or false," and he stressed that neither the likelihood that the confession is untrue nor the preservation of the individual's freedom of will is the sole interest at stake for society is vitally interested in seeing to it that the police obey the law while enforcing it. In *Culombe,* the court dealt with a defendant who was taken into custody and questioned intermittently during a five-day period at the end of which he confessed. He was not subjected to physical brutality and was not deprived of adequate food or sleep. He was for the most part held *incommunicado,* was not warned of his right to remain silent, and was not arraigned promptly following arrest as required by state law. The court held that his confession had been obtained unconstitutionally by the state police and had been improperly received in evidence by the state court. Although a majority of the Supreme Court did not join in the opinion of Justice Frankfurter which announced the court's action, a majority did indicate general agreement with the principles it expressed. *Cf.* "The Supreme Court, 1960 Term," 75 *Harv.*

*L. Rev.* 40, 158–160 (1961). Justice Frankfurter, after referring to earlier cases in the Supreme Court and pointing out that the Federal exclusionary rule of *McNabb v. United States,* 318 *U. S.* 332, 63 *S. Ct.* 608, 87 *L. Ed.* 819 (1943) is not binding on the states and has not generally been followed by them, and that the cautionary requirements of the English Judges' rules are generally not prescribed in the states, had this to say:

"In light of our past opinions and in light of the wide divergence of views which men may reasonably maintain concerning the propriety of various police investigative procedures not involving the employment of obvious brutality, this much seems certain: It is impossible for this Court, in enforcing the Fourteenth Amendment, to attempt precisely to delimit, or to surround with specific, all-inclusive restrictions, the power of interrogation allowed to state law enforcement officers in obtaining confessions. No single litmus-paper test for constitutionally impermissible interrogation has been evolved: neither extensive cross-questioning—deprecated by the English judges; nor undue delay in arraignment—proscribed by *McNabb;* nor failure to caution a prisoner—enjoined by the Judges' Rules; nor refusal to permit communication with friends and legal counsel at stages in the proceeding when the prisoner is still only a suspect—prohibited by several state statutes. See *Lisenba v. People of State of California,* 314 *U. S.* 219, 62 *S. Ct.* 280, 86 *L. Ed.* 166; *Crooker v. State of California,* 357 *U. S.* 433, 78 *S. Ct.* 1287, 2 *L. Ed. 2d* 166; *Ashdown v. State of Utah,* 357 *U. S.* 426, 78 *S. Ct.* 1354, 2 *L. Ed. 2d* 1443.

Each of these factors, in company with all of the surrounding circumstances—the duration and conditions of detention (if the confessor has been detained), the manifest attitude of the police toward him, his physical and mental state, the diverse pressures which sap or sustain his powers of resistance and self-control—is relevant. The ultimate test remains that which has been the only clearly established test in Anglo-American courts for two hundred years: the test of voluntariness. Is the confession the product of an essentially free and unconstrained choice by its maker? If it is, if he has willed to confess, it may be used against him. If it is not, if his will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process. *Rogers v. Richmond,* 365 *U. S.* 534, 81 *S. Ct.* 735, 5 *L. Ed. 2d* 760. The line of distinction is that at which governing self-direction is lost and compulsion, of whatever nature or however infused, propels or helps to propel the confession." 367 *U. S.,* at *p.* 601, 81 *S. Ct.,* at *p.* 1878, 6 *L. Ed. 2d,* at *p.* 1057

Although the quoted portion of Justice Frankfurter's opinion in *Culombe* spoke entirely in terms of the overbearing of the defendant's will (see also *Reck v. Pate,* 367 *U. S.* 433, 81 *S. Ct.* 1541, 6 *L. Ed. 2d* 948, 953 (1961)), the opinion of Chief Justice Warren in *Blackburn* spoke in the additional terms of fundamental fairness. See also *Cicenia v. LaGay,* 357 *U. S.* 504, 509, 78 *S. Ct.* 1297, 2 *L. Ed. 2d* 1523, 1528 (1958). In *State v. Smith, supra,* Justice Hall also spoke in the additional terms of fundamental fairness and quoted extensively from the opinion in *Blackburn.* As expressed by Justice Hall, it is in the greatest degree obligatory that the admissibility of confessions be tested not only by the common law evidential doctrines resting on trustworthiness but also by the deeper requirement of fundamental fairness "as a question of due process." His opinion gave full recognition to the acknowledged principle that the determination in each case must rest on the force of the particular facts presented; after carefully reviewing the circumstances, he concluded that the confessions of Smith and his codefendant, made after several hours of questioning on the day of their arrest, were not preceded by threats or violence or by protracted or persistent inquiries which would amount to "mental or psychological coercion and unfairness in the due process sense." 32 *N. J.,* at *p.* 555. Other cases may readily be cited where this court, after reviewing the particular circumstances, declined to upset the admission into evidence of confessions obtained after the defendant had been arrested and was interrogated while in custody. See *State v. Pierce, supra; State v. Bunk,* 4 *N. J.* 461 (1950), *cert.* denied 340 *U. S.* 839, 71 *S. Ct.* 25, 95 *L. Ed.* 615 (1950); *State v. Cooper,* 10 *N. J.* 532 (1952); *State v. Vaszorich,* 13 *N. J.* 99 (1953), *cert.* denied 346 *U. S.* 900, 74 *S. Ct.* 219, 98 *L. Ed.* 400 (1953); *State v. Walker,* 15 *N. J.* 485 (1954); *State v. Wise,* 19 *N. J.* 59 (1955); *cf. State v. Petrolia,* 21 *N. J.* 453 (1956) and *State v. Bowden,* 62 *N. J. Super.* 339 (*App. Div.* 1960), *certif.* denied 33 *N. J.* 385 (1960), where

the confessions were excluded upon a showing that they had been induced by violence.

In *State v. Pierce, supra,* the defendant was arrested, interrogated for two hours, returned to his cell, and then after two and a half hours was again interrogated. Shortly thereafter he gave an oral confession which was later reduced to writing. There was no evidence of violence or threats although the defendant was never cautioned that he had the right to remain silent and was not taken before a magistrate until late in the day following his arrest. In holding that the confession was properly received in evidence the court approved the general doctrine that a confession is not inadmissible solely because it is made without prior cautioning of the defendant.[1] See also *State v. White,* 27 *N. J.* 158, 170 (1958); *State v. Wise, supra,* 19 *N. J.,* at *p.* 99. With respect to delay in arraignment before a magistrate (see *R. R.* 3:2–3(a))[2] the court, while holding that such delay would not *per se* render the confession inadmissible, pointed out that where there has been undue delay in taking an arrested person before a magistrate, "careful scrutiny will be given to the conditions under which a statement was taken

---

[1] Many of the cases which adhere to the general doctrine point out that the "better and safer" course for police officers is to advise the accused that he has the right to remain silent and that any statements made by him may be used against him. See *State v. Preis,* 89 *Ariz.* 336, 362 *P. 2d* 660, 662 (1961); *Puckett v. State, Okl. Cr.,* 363 *P. 2d* 953, 961 (1961); *Mendoza v. Commonwealth,* 199 *Va.* 961, 103 *S. E. 2d* 1, 4 (1958); *McMillan v. State,* 229 *Ark.* 249, 314 *S. W. 2d* 483, 486 (1958); *cf.* Weisberg, "Police Interrogation of Arrested Persons: A Skeptical View," 52 *J. Crim. L., C. & P. S.* 21, 39–41 (1961); but *cf. Inbau and Reid, Lie Detection and Criminal Interrogation* 223–226 (*3d* ed. 1953).

[2] *R. R.* 3:2–3(a) provides that an officer making an arrest shall take the arrested person before a magistrate "without unnecessary delay." In *State v. Pierce, supra,* Justice Wachenfeld noted that the court rule was "designed to protect persons arrested and taken into custody from being held incommunicado for protracted periods of time, thus stimulating and permitting the suggestion that the confession, when given, was extorted through improper police pressure and methods more popularly designated as the 'third degree.'" 4 *N. J.,* at *p.* 263. See Editorial, 83 *N. J. L. J.* 552 (1960).

from him during the period of delay and such a statement will be admitted in evidence only when it convincingly appears that it was in fact and in truth voluntarily made." 4 *N. J.*, at *p.* 264. See *State v. Smith, supra,* 32 *N. J.,* at *p.* 545; *State v. Bowden, supra,* 62 *N. J. Super.,* at *p.* 356.

In *State v. Cooper, supra,* 10 *N. J.,* at *pp.* 550–553, the court dealt with the admission of confessions by defendants English and Cooper. English was questioned for several hours on the day of his arrest but was allowed frequent respites for rest and meals; he was questioned two or three times for a few minutes on each occasion on the following day; on the third day there was a total of about five to five and a half hours of interrogation with a rest of approximately five hours between sessions, and during the ensuing two days before making his confession the questioning periods were few, brief and widely separated in time. Cooper underwent fewer and shorter interrogations. In sustaining the trial court's admission of the confessions into evidence, Justice Wachenfeld found them to have been made voluntarily and noted that there was nothing in the record to indicate that the defendants:

"were subjected to physical discomfort, mistreatment or inconvenience or deprived of clothing, food or rest, conditions that were alleged and proved in *Watts v. Indiana,* 338 *U. S.* 49, 69 *S. Ct.* 1347, 93 *L. Ed.* 1801 (1949) ; *Turner v. Com. of Pennsylvania,* 338 *U. S.* 62, 69 *S. Ct.* 1352, 93 *L. Ed.* 1810 (1949) ; and *Harris v. South Carolina,* 338 *U. S.* 68, 69 *S. Ct.* 1354, 93 *L. Ed.* 1815 (1949), cited in their brief, and in the other cases collected and discussed in *State v. Pierce, supra.*" 10 *N. J.,* at *p.* 551

We have not discussed the cases such as *Turner, Culombe, Cooper* and *Pierce* with any notion that they are dispositive, for we agree entirely with Justice Stewart's recent comment in *Reck v. Pate, supra,* 367 *U. S.,* at *p.* 442, 6 *L. Ed.* 2*d,* at *p.* 954, that the process of decision in this area, as in most areas, requires much more than a mere "color-matching" of cases. Nevertheless, it is not inappropriate to compare the case at hand with the earlier cases.

The interrogation in *Turner* was more persistent and protracted than the interrogation to which Fauntleroy was subjected. Unlike the defendant in *Culombe,* Fauntleroy is not a "high moron"; on the contrary, his answers during the course of the trial evidence alertness and respectable measures of understanding and expression. Unlike the defendants in *Cooper* and *Pierce,* Fauntleroy alleged that he was subjected to violence, was denied adequate food and rest and was otherwise mistreated. The defendant Fauntleroy's testimony as to the alleged violence was disputed by the officers, although their denials were in general terms and the State might well have amplified and supported them at least where the defendant's testimony dealt in specifics. Thus the defendant testified during the course of the trial that he was kicked in the stomach and he attributed a swelling, which he displayed during the trial, to the alleged kick. None of the State's testimony, medical or otherwise, addressed itself specifically to this condition. Other allegations of misconduct advanced by the defendant and briefly referred to hereinafter, might well have been met more fully and directly in the course of the presentation of the testimony on the State's behalf.

When on July 28 Fauntleroy was originally arrested, without any written warrant, the State admittedly had no sufficient basis for charging him with murder. His arrest was supposedly as a material witness and because of a "possible wanted sticker" which was not later referred to by the State. From the time he was taken into custody the defendant was held "under restriction" or *incommunicado* and he was not cautioned at any time prior to Monday, August 1 when he signed his second statement. He was not arraigned before a magistrate until Tuesday, August 2. The record is obscure as to any attempts by the defendant to communicate with counsel or friends and it is likewise unclear as to whether, in the light of his background and previous experience, the defendant was aware of his undoubted right to refuse to disclose any matters which might incrimi-

nate him. See *N. J. S.* 2A:84A–19. The defendant's testimony was patently designed to establish that while he was in custody and being interrogated he was denied proper food and sleep; notwithstanding this, the State did not introduce any testimony of its own with respect to the food served or the sleeping facilities afforded. There are uncertainties as to the periods of interrogation and although the officers indicated that there are formal records at Newark Police Headquarters which would establish the actual periods during which the defendant was out of his detention cell, these records were not presented at the trial. There was some testimony that on Sunday afternoon July 31, the defendant indicated his readiness to make a statement and that on the following day he stated he was willing to make a statement and was then advised that anything he said could be used against him. But the record is rather skimpy in this connection and might well have been elaborated by the State to support its assertion that the defendant's abrupt change from his previous denial of implication was a voluntary one and the result of "an essentially free and unconstrained choice." See *Culombe v. Connecticut, supra.*

The trial judge was under the heavy responsibility of determining whether the State, in its proffer of the confessions in evidence, had carried its burden (see *State v. Tune,* 13 *N. J.* 203, 215 (1953); *State v. Smith, supra,* 32 *N. J.,* at *p.* 559) of establishing that the defendant's will had not been overborne and that the fundamental fairness requirement of the due process clause had not been violated. In discharging this responsibility, he was constitutionally obliged to apply the standard which had been expressed in the controlling Federal and State cases and had been recently restated in *State v. Smith, supra.* Our examination of the record convinces us that he failed to do so. When counsel for the defendant objected to the introduction of the confessions into evidence he carefully called the trial judge's attention to the pertinent cases including *Turner v. Pennsylvania, supra* and *State v. Pierce, supra.* And he

properly pointed out that, under those cases, the voluntariness of the confessions was to be passed upon after due consideration and evaluation of, not only the evidence relating to the alleged physical violence, but also the evidence which indicated that the police had, unlawfully and in flagrant disregard of the individual rights of the defendant, held him *incommunicado* for a period of five days prior to arraignment and had questioned him intermittently without cautioning him as to his right to remain silent and without furnishing to him proper food and affording to him proper facilities for sleep. In response to the position of defense counsel, the trial judge erroneously suggested that *Turner* would be inapplicable to proceedings in a New Jersey State court. He summarily dismissed the delay by the police in arraigning the defendant, their holding him *incommunicado,* and their failure to caution him or advise him of his rights, as "technical" violations.[3] His single inquiry with reference to the food served the defendant and the sleeping facilities afforded to him was whether any other prisoners had received "any better treatment." He expressed the

---

[3] This description is inappropriate and fails to give suitable recognition to the serious and truly disturbing nature of the violations. *Cf.* Douglas, J., concurring in *Culombe v. Connecticut, supra,* 367 *U. S.,* at *p.* 639, 6 *L. Ed.* 2d, at *p.* 1079, and in *Reck v. Pate, supra,* 367 *U. S.,* at *p.* 444, 6 *L. Ed.* 2d, at *p.* 958:

"People arrested by the police may produce confessions that come gushing forth and carry all the earmarks of reliability. But detention incommunicado for days on end is so fraught with evil that we should hold it to be inconsistent with the requirements of that free society which is reflected in the Bill of Rights. It is the means whereby the commands of the Fifth Amendment (which I deem to be applicable to the States) are circumvented. It is true that the police have to interrogate to arrest; it is not true that they may arrest to interrogate. I would hold that any confession obtained by the police while the defendant is under detention is inadmissible, unless there is prompt arraignment and unless the accused is informed of his right to silence and afforded an opportunity to consult counsel."
*But cf.* Inbau, "Police Interrogation—A Practical Necessity," 52 *J. Crim. L., C. & P. S.* 16–20 (1961).

view that the alleged inadequacies of food and sleeping facilities and the police violations, which he again described as technical, would not warrant exclusion of the confessions so long as there was no "brutality or misrepresentation." The colloquy at this time indicated that the term "brutality" was being used in the sense of physical violence, alleged by the defendant but denied by the police. When the trial judge finally ruled that the confessions should be received in evidence he did not make any factual findings although it may be assumed that he found that there had not been any "misrepresentation" and no "brutality" in the sense of physical violence. But that finding was insufficient and the standard was erroneous—it disregarded the now well recognized concept that a man's will may be overborne, even without misrepresentation or physical violence, when there has been police interrogation under circumstances from which mental or psychological coercion is to be inferred (*Culombe v. Connecticut, supra; Turner v. Pennsylvania, supra*), and the intertwined concept that, even without misrepresentation or physical violence, a confession may be obtained under circumstances so fundamentally unfair as to dictate its exclusion in later judicial proceedings (*Blackburn v. Alabama, supra; State v. Smith, supra*).

In *Rogers v. Richmond,* 365 *U. S.* 534, 81 *S. Ct.* 735, 5 *L. Ed. 2d* 760 (1961), the defendant Rogers was arrested and was taken at a later date to the office of the state's attorney where he was questioned throughout an afternoon and evening. During the questioning the defendant denied that he had done the shooting until the chief of police pretended that he was making a telephone call directing an officer to hold himself in readiness to bring the defendant's wife in for questioning. After the passage of an hour during which the defendant remained silent, the chief of police indicated that he was about to take the defendant's wife into custody and at that point the defendant stated that he would make a confession. In concluding that the confession was voluntary and could be received in evidence,

the trial judge found that the pretense by the chief of police "had no tendency to produce a confession that was not in accord with the truth." On appeal, the state Supreme Court also took the view that the probable reliability of the confession was a circumstance of weight in determining its voluntariness. This was held by the United States Supreme Court to be an impermissible standard. Justice Frankfurter pointed out that the attention of the trial judge should have been focused on the question of whether the behavior of the police officials was such as to overbear the defendant's will to resist and bring about a confession not freely self-determined. That question, he said, was to be answered under the dictates of our *Federal Constitution*, without regard to whether or not the defendant "in fact spoke the truth." See 365 *U. S.*, at *p.* 544, 5 *L. Ed. 2d,* at *p.* 768; *cf. State v. Cooper, supra,* 2 *N. J.*, at *p.* 558. The conviction of the defendant Rogers was set aside and the case was remanded to enable the state to retry the defendant within a reasonable time. Similarly, we believe that in the instant matter the conviction of the defendant Fauntleroy must be set aside because of the failure of the trial judge to apply a constitutionally proper standard. Retrial of the defendant should be held at an early date and during the course thereof the obscurities in the pertinent testimony may be removed and the admissibility of the confessions may be passed upon by the trial judge in accordance with the controlling standard expressed in *State v. Smith, supra.*

In addition to his point relating to the confessions, the defendant asserts various alleged errors which will be mentioned here to avoid unnecessary disputations at the retrial. In Point I of his brief he contends that, even assuming the admissibility of the confessions in evidence, a jury could not find beyond a reasonable doubt that the defendant had "the intent to rape or commit sodomy upon the deceased as charged by the State." We find no merit to this contention and need only refer to the inferences which may reasonably

be drawn from the condition of the apartment, the position of the body and its state of undress and the location of the panties and the sanitary napkin support. In Point II the defendant urges that the State failed to introduce any independent evidence to corroborate or bolster the confessions. He cites *State v. Lucas,* 30 *N. J.* 37 (1959) and *State v. Johnson,* 31 *N. J.* 489 (1960) where this court held that, in order to rely upon a confession, the State must introduce independent proof of circumstances which strengthen the confession and tend to generate "a belief in its trustworthiness." See 30 *N. J.,* at *p.* 56, and 31 *N. J.,* at *p.* 502. We are satisfied that here there was such independent proof and refer particularly to the evidence as to the objective findings in the apartment, the evidence with respect to the blood on the defendant's trousers and underneath his fingernails, the evidence with respect to the defendant having had his pants cleaned on the morning of July 27, and the evidence relating to the defendant's activities prior to and subsequent to the approximate time when the decedent was murdered.

In Point III the defendant complains about the admission of photographs of the decedent. The trial judge admitted only such photographs as he found to be relevant to the State's case and not unduly inflammatory. We have examined the photographs in the light of all of the evidence and cannot say that his action went beyond his discretionary authority. See *State v. Smith,* 27 *N. J.* 433, 449 (1958), *cert.* denied 361 *U. S.* 861, 80 *S. Ct.* 120, 4 *L. Ed. 2d* 103 (1959). In Point IV the defendant refers to an inadvertence in the trial judge's charge which was later clarified by an answer in response to a special inquiry from the jury. No further comment is necessary in this connection since the matter will not arise at the retrial. In Point V the defendant objects to testimony describing a scream which was allegedly heard by a resident at 2 Stratford Place on July 27 between 9:00 A. M. and 9:45 A. M. There was evidence from which the jury could infer that the decedent was murdered at that hour and

the statements of the defendant placed him in her apartment at about that time. The testimony was clearly relevant and was properly admitted for the jury's consideration. See *McCormick, Evidence* 314 *et seq.* (1954). In Point VI the defendant complains about the trial judge's denial of a requested charge that there was uncontroverted evidence in the case to the effect that a blood spot found near the body of the decedent would have been completely dried in not more than 24 hours and that, absent special reason to the contrary, such uncontroverted evidence should be accepted. The evidence referred to was that of a defense witness who had not seen the apartment or its contents but who gave his expert opinion upon the basis of photographs taken after the decedent's body was discovered. The jury clearly had the right to reject his opinion and the trial court properly denied the requested charge. *Cf. State v. Scelfo,* 58 *N. J. Super.* 472, 477 (*App. Div.* 1959), *certif.* denied 31 *N. J.* 555 (1960); *Panko v. Grimes,* 40 *N. J. Super.* 588, 594 (*App. Div.* 1956); 2 *Wharton's Criminal Evidence* § 527 (*12th ed.* 1955).

Reversed and remanded for a new trial.

*For reversal*—Chief Justice WEINTRAUB, and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN—7.

*For affirmance*—None.